STATE OF NORTH CAROLINA v. THOMAS MARK ADAMS

No. 3A89

(Filed 28 January 1994)

1. **Constitutional Law § 344 (NCI4th)— ex parte bench conferences—excusal of prospective jurors—harmless error**

It was error violating a capital defendant's unwaivable state constitutional right to be present at every stage of his trial for the trial judge to conduct *ex parte* bench conferences with three prospective jurors after which those prospective jurors were excused. However, the transcript reveals that the substance of the unrecorded communications with the three prospective jurors was adequately reconstructed by the trial judge for the record and that defendant's absence from the conferences was harmless beyond a reasonable doubt where it appears from the record that two prospective jurors were ineligible to serve due to their recent service as prospective jurors, and that the third juror was deferred for the manifestly unobjectionable reason that he was to be a pallbearer at a funeral the next day.

**Am Jur 2d, Criminal Law §§ 695, 696.**

**Validity of jury selection as affected by accused's absence from conducting of procedures for selection and impaneling of final jury panel for specific cases. 33 ALR4th 429.**

2. **Constitutional Law § 344 (NCI4th)— ex parte communications with prospective jurors—burden of showing error—showing of harmless error by State**

The State was not precluded from showing that the trial court's *ex parte* communications with prospective jurors was harmless error because the record does not reveal whether prospective jurors other than the three named in the transcript may have been questioned off the record since the appellant has the burden in the first instance of demonstrating error from the record on appeal; this means that it is not enough for defendant to assert that there may have been other impermissible *ex parte* communications but that defendant must show from the record that the trial judge examined off the record prospective jurors other than those named; and the record in this case, including the transcript of the trial, does

STATE v. ADAMS

[335 N.C. 401 (1994)]

not reveal that any other prospective jurors were examined *ex parte* by the trial judge.

**Am Jur 2d, Criminal Law §§ 695, 696.**

**Validity of jury selection as affected by accused's absence from conducting of procedures for selection and impaneling of final jury panel for specific cases. 33 ALR4th 429.**

3. **Jury § 251 (NCI4th) — peremptory challenges — racial discrimination — failure to object**

The white defendant's failure to object to the prosecutor's peremptory challenges of black jurors on the ground they were based on race precluded him from raising this issue on appeal. Defendant cannot, avail himself of the exception to the objection requirement enunciated in *State v. Robbins*, 319 N.C. 465, and *State v. Davis*, 325 N.C. 607, where his trial was held some two years after the decision in *Batson v. Kentucky*, 476 U.S. 79, prohibited the prosecutor's use of peremptory challenges in a racially discriminatory manner.

**Am Jur 2d, Jury § 235.**

4. **Criminal Law §§ 542, 543 (NCI4th) — prosecutorial misconduct during cross-examination — not reversible error**

It was improper for the prosecutor in a capital trial to ask a psychologist who testified for defendant questions on cross-examination designed merely to belittle and insult the witness and to make declaratory responses to the witness's answers which were designed merely to produce laughter in the courtroom. Furthermore, the prosecutor's tactic of tapping or pounding a stick near this witness in a manner which caused the witness to believe he might be struck and for the purpose of irritating or provoking the witness amounted to prosecutorial misconduct violating our Rules of Professional Conduct and generally applicable professional standards. However, the prosecutor's misconduct during the cross-examination of the psychologist did not constitute reversible error entitling defendant to a new trial on the issue of his guilt where the record shows that the trial judge was actively overseeing the cross-examination of the psychologist in an effort to "rein-in" the prosecutor's overzealousness and that he frequently sustained defendant's objections to unseemly prosecutorial remarks to the psychologist; despite the prosecutor's barrage of ques-

tions and comments directed at impugning his credibility and entertaining the jury, the psychologist maintained his composure and in some instances succeeded in bolstering his testimony; the substance of the psychologist's testimony appears largely unharmed by the prosecutor's conduct and no inherently prejudicial information came before the jury; and a psychiatrist whose cross-examination by the prosecutor is not the subject of complaint gave testimony which was essentially the same as that of the psychologist.

**Am Jur 2d, Trial § 252.**

5. **Evidence and Witnesses § 2302 (NCI4th); Homicide § 490 (NCI4th)— first-degree murder—intent to kill, premeditation and deliberation—effect of mental disabilities—failure to instruct not plain error**

The trial court should have instructed the jury in a first-degree murder trial with regard to defendant's personality disorder as it related to his capacity to premeditate and deliberate and to form a specific intent to kill where a psychologist stated his opinion that, although defendant was capable of forming the specific intent to kill prior to the murder, under the stress of the confrontation with the victim defendant "was no longer able to form that intent." However, the trial court's failure to give this instruction did not constitute plain error entitling defendant to a new trial where defendant failed to object to the instructions as given or to request an instruction on his mental disabilities; the weight of the psychologist's opinion was diminished by his further testimony that defendant's history demonstrated that, under stress or pressure, defendant's disorganization and impulsivity manifested itself in flight and withdrawal; defendant's clear and unequivocal out-of-court confessions of a deliberate killing of the victim on the morning of the murder make it improbable that the jury would have found that he was incapable of forming the specific intent to kill; and defendant thus has not shown that such an instruction would have probably resulted in the jury reaching a different verdict.

**Am Jur 2d, Expert and Opinion Evidence §§ 193, 194, 362, 363; Homicide § 501.**

**Admissibility of expert testimony as to whether accused had specific intent necessary for conviction. 16 ALR4th 666.**

**6. Criminal Law § 757 (NCI4th) — instruction on reasonable doubt — due process**

The trial court's instruction that a reasonable doubt is "an honest, substantial misgiving" did not reduce the State's burden of proof in violation of defendant's constitutional right to due process.

**Am Jur 2d, Trial § 1375.**

**7. Criminal Law § 1352 (NCI4th) — capital sentencing — McKoy error — new sentencing hearing**

The trial court's instructions in a capital sentencing proceeding requiring the jury to unanimously find mitigating circumstances before considering any of those circumstances in their deliberations on punishment constituted prejudicial error for which defendant is entitled to a new sentencing hearing.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**Unanimity as to punishment in criminal case where jury can recommend lesser penalty. 1 ALR3d 1461.**

Justice MITCHELL concurring in the result.

Justice PARKER did not participate in the consideration or decision of this case.

Appeal by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment sentencing him to death imposed by Lewis (John B.), J., presiding at the 31 October 1988 Criminal Session of Superior Court, Iredell County. Heard in the Supreme Court on 16 April 1992.

*Lacy H. Thornburg, Attorney General, by Thomas J. Ziko, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, for defendant-appellant.*

EXUM, Chief Justice.

On 14 March 1988, defendant was indicted for first degree burglary, robbery with a dangerous weapon and the murder of Mildred Hendrix Foster. Defendant pled guilty to the two burglary charges against him. At trial, a jury found defendant guilty of first degree murder. After a capital sentencing hearing, the jury

recommended the death penalty for defendant. The trial court sentenced defendant to death. Defendant appeals from that judgment.

Defendant brings forward five assignments of error relating to the guilt phase of his trial on the first degree murder indictment and eight assignments relating to the sentencing phase. The State concedes that in the sentencing proceeding the trial court erred under the United States Supreme Court's holding in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990) and recommends that this Court remand the case for re-sentencing in accordance with *McKoy*. We find no reversible error in the guilt phase of defendant's trial. Concluding there is *McKoy* error in the trial court's jury instructions in the sentencing phase, we remand the case for a new sentencing proceeding.

I.

The State offered evidence during the guilt phase, including defendant's two pretrial statements made to investigators by which he essentially admitted committing the acts forming the basis of the charges against him, which tended to show as follows:

At approximately 1:30 a.m. on 13 December 1987, the seventeen year old defendant broke into and entered the home of seventy year old Mildred Hendrix Foster with the intention of stealing money from Ms. Foster to buy marijuana. At the time defendant entered Ms. Foster's home, he was carrying a large kitchen knife that he had taken from the home of his parents for the purpose of scaring the victim. After unsuccessfully searching the other rooms of the Foster home for money, defendant moved into Ms. Foster's bedroom. Ms. Foster awoke as defendant was searching for her pocketbook.

Ms. Foster screamed and attempted to struggle with defendant. Defendant asked Ms. Foster to remain quiet and told her that he would not harm her. Ms. Foster continued to scream and managed to obtain the knife which defendant had laid down during his search of her room. Ms. Foster bit defendant when he put his hand over her mouth to quiet her, and she attempted to stab him with the knife. Defendant eventually regained control of the knife and stabbed Ms. Foster in the chest. Defendant told police that he stabbed her several more times in the chest to keep her from further suffering. As the victim struggled to live, defendant slashed her throat with the knife, killing her. After killing the

victim, defendant took thirty-eight dollars from her purse and fled the house.

Defendant returned to his house and soon decided to turn himself in. At approximately 3:00 a.m., defendant appeared at the Davie County Sheriff's Department where he had driven in his car. He had blood on his clothes and was crying hysterically. He made several references to "that poor old lady." After calming down, defendant stated that he had broken into a house, which the authorities were able to identify as the home of Ms. Foster. At first, defendant made several short statements indicating he had stabbed Ms. Foster. Defendant was immediately advised of his juvenile rights. Within three to four hours of arriving at the sheriff's department, defendant made two detailed voluntary statements to a detective and an agent of the State Bureau of Investigation. The statements were reduced to writing and signed by defendant.

The parties stipulated that the victim was stabbed six times in the chest and that her throat had been cut. The parties further stipulated that all wounds were inflicted within a very close period of time and that Ms. Foster died from loss of blood within a few minutes of receiving her wounds.

Defendant's evidence at the guilt phase consisted of the testimony of two mental health experts, a psychologist and a psychiatrist, and dealt with his state of mind at the time of the murder:

Dr. John Warren, a psychologist, testified that he had examined defendant at the Davie County Jail on three occasions in 1988: 13 August, 9 September and 28 September. He also reviewed defendant's statements to the authorities on the morning of the murder, his school records, mental health treatment records and a report from Dorothea Dix Hospital. Dr. Warren diagnosed defendant as suffering from (1) borderline personality disorder with dependent and histrionic traits and (2) dependence on marijuana. Dr. Warren testified that defendant had been involved in several earlier break-ins in order to obtain money for his marijuana use. Defendant had been caught in the spring of 1987, pled guilty and had been sentenced to five years probation and fifteen weekends in jail.

In response to defense counsel's questions regarding defendant's ability to form the specific intent to kill, Dr. Warren testified as follows:

My opinion is that—that prior to going to the house, Tommy was capable of forming specific intent. At some point, he became disorganized and fell apart and was no longer able to form that intent. He was not calm, he was not together, he was in pieces and very disorganized.

Dr. Selwyn Rose, a psychiatrist who was qualified as an expert in forensic psychiatry, also testified as to defendant's state of mind. Dr. Rose diagnosed defendant as suffering from (1) marijuana dependency and (2) borderline personality disorder with particular traits of immaturity and impulsivity. He further testified that he believed defendant fell apart under stress that night and, at the time of the murder, could not conform his conduct to the requirements of the law. During cross-examination by the prosecution, Dr. Rose also stated that, under the stress of the confrontation with the victim, defendant did not have the ability to tell right from wrong.

The State presented no evidence during the penalty phase of defendant's trial. Defendant presented evidence which tended to show as follows:

Defendant's father, mother, half-brother, uncle, sister, one of his teachers, and a family friend each testified that defendant had never been known to be violent. Defendant was described as being shy, liking animals, and usually befriending younger children. He had not been a discipline problem at school. Although he did well in elementary school, he was not a good student in junior and senior high school. Defendant had a drug problem which became known to his parents during the spring of 1987. Defendant was small for his age. He was generally a "follower" and was known to get along well with others. The witnesses testified they had never seen defendant act aggressively or violently.

**STATE v. ADAMS**

[335 N.C. 401 (1994)]

## II.

### *Guilt Phase Issues*

#### A.

**[1]** Defendant first contends that the trial court violated his right to be present at every stage of a capital proceeding[1] by conducting *ex parte* bench conferences with prospective jurors after which some prospective jurors were excused. Though the trial court's action was error, we hold that the error was harmless beyond a reasonable doubt.

After the case was called for trial and prospective jurors were called into the courtroom to begin the jury selection process, Judge Lewis in open court and on the record instructed the prospective jurors on qualifications for jury service. He then stated that there might be "other reasons" why a juror should not serve, mentioning specifically doctor certified physical illness; and he invited any juror who had "any reasons" to come to the bench "to tell me why you should not serve on jury this week." The trial transcript at that point states:

(EXCUSES HEARD BY THE COURT)

THE COURT: Mr. Sloan indicates that he is a pallbearer in a funeral tomorrow, we have a group of jurors coming in on Wednesday and so Mr. Sloan you will come in on Wednesday.

Ms. Gillian and Mrs. Holler indicate that they have served within the last two years, and therefore, would be ineligible.

Stand by and we'll put something in the file about that.

After these comments, the trial judge resumed giving instructions to the rest of the prospective jurors.

It was error violating a capital defendant's unwaivable state constitutional right to be present at every stage of his trial for Judge Lewis to speak privately with prospective jurors. *State v.*

---

1. A defendant's right to presence at every stage of a criminal trial is guaranteed by the Confrontation Clause of the North Carolina Constitution, Art. I, § 23. *State v. Huff*, 325 N.C. 1, 29, 381 S.E.2d 635, 650-51 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). Though alluding to the federal constitution as a basis of the right to presence, defendant's argument relies exclusively on the definition of the right contained in North Carolina law. We limit our discussion accordingly.

STATE v. ADAMS

[335 N.C. 401 (1994)]

*Boyd*, 332 N.C. 101, 104, 418 S.E.2d 471, 473 (1992); *State v. Moss*, 332 N.C. 65, 74, 418 S.E.2d 213, 218 (1992). This violation is, however, subject to harmless error analysis. *State v. Payne*, 328 N.C. 377, 402 S.E.2d 582 (1991); *State v. Artis*, 325 N.C. 278, 297, 384 S.E.2d 470, 480 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). The harmlessness of the error must be demonstrated by the State beyond a reasonable doubt. *Huff*, 325 N.C. at 33, 281 S.E.2d at 653. Where "the transcript reveals the substance of the conversations, or the substance is adequately reconstructed by the trial judge at trial," the State may be able to prove that the error was harmless beyond a reasonable doubt. *Boyd*, 332 N.C. at 106, 418 S.E.2d at 474.

Here the transcript reveals that the substance of the unre-corded communications with the three jurors was adequately reconstructed by the trial judge and that the defendant's absence from the conference was harmless. We said in *Payne*, "[t]hose potential jurors who were excused because of their responses to questions about statutory qualifications, physical infirmities, and personal hardships were either ineligible to serve or excused for manifestly unobjectionable reasons regardless of what defendant might have observed or desired." *Payne*, 328 N.C. at 389, 402 S.E.2d at 589. Similarly, in the case at bar, prospective jurors Gillian and Holler were ineligible to serve due to their recent service as prospective jurors; prospective juror Sloan, who had arranged to be a pallbearer at a funeral, was deferred for a "manifestly unobjectionable" reason. Thus, the State has shown that the error in communicating *ex parte* with prospective jurors was harmless beyond a reasonable doubt.

[2] Defendant, apparently recognizing that any error with regard to prospective jurors Sloan, Gillian and Holler, has been rendered harmless, argues that because the record does not reveal whether other prospective jurors were questioned off the record, the State cannot demonstrate harmlessness. However, it is the *appellant* who has the burden in the first instance of demonstrating error from the record on appeal. *State v. Milby and State v. Boyd*, 302 N.C. 137, 141, 273 S.E.2d 716, 719 (1981) (appellant has duty to "make the irregularity manifest") (citing *State v. Hilton*, 271 N.C. 456, 156 S.E.2d 833 (1967); *State v. Duncan*, 270 N.C. 241, 154 S.E.2d 53 (1967)). This means defendant must show from the record that the trial judge examined off the record prospective jurors other

STATE v. ADAMS

[335 N.C. 401 (1994)]

than those named. It is not enough for defendant to assert that there may have been other impermissible *ex parte* communications. The record must reveal that such communications in fact occurred. *Id.; see also State v. Williams*, 274 N.C. 328, 333, 163 S.E.2d 353, 357 (1968) ("An appellate court is not required to, and should not, assume error by the trial judge when none appears on the record"). Here the record, including the transcript of the .trial, does not reveal that any other prospective jurors were questioned by the trial judge. "[W]e must assume that the trial court caused the record to speak the complete truth in this regard." *Artis*, 325 N.C. at 297, 384 S.E.2d at· 480 (quoting *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987) ). Furthermore, the clear implication from the transcript is that the three named prospective jurors and no others were questioned by the trial judge. Indeed, after the trial judge had spoken *ex parte* with the prospective jurors, he responded to their requests *on the record*, naming the jurors and describing the excuses given by each one. His very thoroughness in creating a record suggests that he left no one out of his account.

Defendant argues in his brief, "[t]he incompleteness of the record precludes the State from satisfying its burden of proving harmless error beyond a reasonable doubt." To the contrary, however, whatever incompleteness may exist in the record precludes defendant from showing that error occurred as to any juror other than those the trial judge excused or deferred on the record.

B.

[3] By his second assignment of error, defendant, who is white, contends the trial court erred by permitting the prosecution to exercise peremptory challenges against various black jurors on account of their race in violation of the Fourteenth Amendment's Equal Protection Clause as interpreted by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), and *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411 (1991). *Batson* held a prosecutor may not purposefully discriminate against jurors who are members of the same "cognizable racial group" as the defendant by exercising "peremptory challenges to remove from the venire members of defendant's race . . . on account of their race." 476 U.S. at 96, 90 L. Ed. 2d at 87-88. Concluding that "*Batson* recognized that a prosecutor's discriminatory use of peremptory challenges harms the excluded jurors and the community at large,"

499 U.S. at ---, 113 L. Ed. 2d at 422, the Court in *Powers* prohibited discriminatory use of peremptory challenges against black jurors in a case in which the defendant was white. Although the defendant now asserts that the State used its peremptory challenges in violation of *Batson*, the record reveals that defendant failed to object to the prosecution's use of peremptory challenges on the ground they were based on race. Defendant's failure to object to the prosecutor's challenges on this ground precludes him from raising this issue on appeal. With certain exceptions, to preserve on appeal a trial error a timely objection to the error at trial is required. N.C.G.S. § 15A-1446(a) & (b) (1983 & Cum. Supp. 1985); *see State v. Davis*, 325 N.C. 607, 617-18, 386 S.E.2d 418, 423 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990); *State v. Robbins*, 319 N.C. 465, 477-78, 356 S.E.2d 279, 293, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); *State v. McDougall*, 308 N.C. 1, 9, 301 S.E.2d 308, 314, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983).

Defendant, citing *Robbins* and *Davis*, argues that no objection to discriminatory peremptory challenges is necessary. *Robbins* and *Davis*, however, emphasized the general rule that the party raising this issue on appeal must ordinarily have made an objection at trial. *Robbins*, 319 N.C. at 487-88, 356 S.E.2d at 293; *Davis*, 325 N.C. at 617-18, 386 S.E.2d at 423. In *Robbins* and *Davis* the defendants were permitted to challenge on appeal the prosecutor's alleged violation of *Batson* without having objected at trial only because *Batson* had not yet been decided at the time of trial. Both cases expressly limited their holdings to such situations. In *Robbins*, the Court stated:

Although the case *sub judice* was tried prior to the date the rule in *Batson* was announced, the applicability of *Batson* to this case has since been settled by *Griffith v. Kentucky*, 479 U.S. ---, 93 L.Ed. 2d 649 (1987), which mandates that the rule has retrospective application to all cases pending on direct appeal or which were not yet final when *Batson* was decided.

Initially, we note that whereas in *Batson* the defendant entered a timely objection at trial to the prosecutor's removal of all black persons on the venire, defendant here neither objected to the use of the district attorney's peremptory challenges to remove black jurors nor made a challenge to the petit jury before the jury was empaneled. *Normally, failure to object at trial would preclude our consideration of this issue*. N.C.G.S.

§. 15A-1446(a), (b) (1983 & Cum. Supp. 1985); *see State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983); *Miller v. State*, 237 N.C. 29, 74 S.E.2d 513, *cert. denied*, 345 U.S. 930, 97 L. Ed. 2d 1360 (1953). However, defendant claims that any such objection would have been futile under the law of North Carolina as it existed at the time. Although the futility of presenting an objection at trial cannot alone constitute cause for a failure to object, *Engle v. Isaac*, 456 U.S. 107, 130, 71 L. Ed. 2d 783, 802 (1982), we find it difficult to hold that defendant has waived a right *which he did not know existed at the time of trial.*

*Robbins*, 319 N.C. at 487-88, 356 S.E.2d at 293 (emphasis added). Similarly, in *State v. Davis* we permitted the defendant to challenge the prosecutor's peremptory challenges even though the defendant had made no objection at trial. *Davis*, 325 N.C. at 617-18, 386 S.E.2d at 423. In *Davis*, however, as in *Robbins*, the case was tried before the *Batson* decision; furthermore, the defendant in *Davis* made a pretrial motion to prohibit the State from exercising its peremptory challenges in a racially discriminatory fashion. *Id.*

In the present case, unlike the situations presented in *Robbins* and *Davis*, trial was held some two years after the Supreme Court's holding in *Batson*. We must assume defendant through counsel was familiar with *Batson* but elected not to raise the issue at trial. Defendant cannot, therefore, avail himself of the exception to the objection requirement enunciated in *Robbins* and *Davis*.

C.

[4] By his third assignment, defendant contends that the trial court erred in denying his motion for a mistrial on the basis of the prosecutor's "insulting" and "improper" cross-examination of defense expert Dr. John Warren. The cross-examination of Dr. Warren occurred over the course of two days and covers over 170 pages of the trial transcript. Defendant argues that some of the prosecutor's cross-examination of Dr. Warren was designed solely to badger, insult, belittle and otherwise harass the witness.

We have stated that counsel may not "ask impertinent and insulting questions which he knows will not elicit competent or relevant evidence but are designed simply to badger and humiliate the witness." *State v. Britt*, 288 N.C. 699, 711, 220 S.E.2d 283, 291 (1975), *appeal after remand*, 291 N.C. 528, 231 S.E.2d 644 (1977).

STATE v. ADAMS

[335 N.C. 401 (1994)]

Without setting out in detail those portions of the cross-examination complained of, we agree with defendant that some of it was improper. Some of the cross-examination appears to have been designed merely to belittle and insult the witness who, testifying as an expert, was trying to give his honestly held opinions of defendant's mental state based in part on certain psychological tests which he had administered to defendant. Other portions are the prosecutor's declaratory responses to the witness' answers, which responses seem designed merely to produce laughter in the courtroom and did, according to the transcript, cause laughter among the jurors. This caused the trial judge at one point to take a recess, saying, "Jurors, this is a very tense moment and we need to be recessed by five minutes."

It suffices for us to say by way of reminder that criminal trials, especially capital trials, are not circuses conducted for the purpose of entertainment. They are solemn proceedings at which witnesses are examined and cross-examined according to the rules of evidence by counsel who are expected to conduct themselves with dignity, courtesy and a sense of fair play toward the court, opposing counsel, parties and witnesses according to the traditions of the legal profession and the admonitions in the Code of Professional Conduct. Sometimes humor in the courtroom occurs spontaneously and harmlessly; sometimes it is appropriate for counsel purposely to employ it to make a proper point. It should never be employed merely for counsel's own amusement or to embarrass or belittle unfairly other trial participants, including witnesses. We conclude that some of the cross-examination here fell on the wrong side of this line which, we admit, is not always easy to draw.

We do, however, wish to address one particularly disturbing instance during the cross-examination of Dr. Warren. The prosecutor, apparently out of sight of the trial judge, was tapping a yardstick on the side of the witness stand when Dr. Warren grabbed the stick out of the prosecutor's hand. The following exchange then took place:

MR. ZIMMERMAN [the prosecutor]: You leave my stuff alone, professor. (Referring to yardstick counsel is holding.)

[Defense Counsel]: Objection.

A. I feel like that you're going to use a stick here on me.

**STATE v. ADAMS**

[335 N.C. 401 (1994)]

Q. (Mr. Zimmerman) We'll put the stick down, please go right ahead now, now tell us what picture number three has it in [sic].

THE COURT: Wait, now, Dr. Warren, had you finished your answer.

A. I believe so. He was pounding the stick over here where you can't see it.

Later during the State's closing arguments Mr. Zimmerman, the prosecutor, stated as follows:

. . . [D]o you remember the professor, Dr. Warren, was up here on the stand and I had the yardstick and I was tap, tap, tapping it and what did he do, he reached around and grabbed the yardstick because as he said, I was irritating him. *I was trying to irritate him to see what he'd do to reach around and grab the stick.*

(Emphasis added.)

The tactic of tapping or pounding a stick near a witness in a manner which causes the witness to believe he may be struck and for the purpose of irritating or provoking a witness amounts to prosecutorial misconduct which warrants our condemnation. Such conduct violates our Rules of Professional Conduct and generally applicable professional standards. Further, an attorney engaging in such conduct may be subject to appropriate sanctions. Rule 7.6 of our Rules of Professional Conduct, dealing with trial conduct, provides in part:

In appearing in his professional capacity before a tribunal, a lawyer shall not:

. . .

(6) Engage in undignified or discourteous conduct which is degrading to a tribunal.

. . .

(8) Engage in conduct intended to disrupt a tribunal.

Rules of Professional Conduct, Rule 7.6(C)(6),(8) *North Carolina Rules of Court* 446 (West Publishing Co. 1994). The Prosecution Function Standards of the American Bar Association Standards for Criminal Justice provide:

STATE v. ADAMS

[335 N.C. 401 (1994)]

> The interrogation of all witnesses should be conducted
> fairly, objectively, and with due regard for the dignity
> and legitimate privacy of the witness, and without seeking
> to intimidate or humiliate the witness unnecessarily.

ABA Standards for Criminal Justice, Prosecution Function and
Defense Function std. 3-5.7(a) (3d ed. 1993). Regarding professionalism
in the courtroom, those standards also provide:

> As an officer of the court, the prosecutor should support
> the authority of the court and the dignity of the trial
> courtroom by strict adherence to codes of professionalism
> and by manifesting a professional attitude toward the judge,
> opposing counsel, witnesses, defendants, jurors, and others
> in the courtroom.

*Id.* std. 3-5.2. A prosecuting attorney "may prosecute with
earnestness and vigor—indeed, he should do so. But, while he may
strike hard blows, he is not at liberty to strike foul ones." *Berger
v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 1321 (1935).

While we think the prosecutor's behavior in the cross-
examination of Dr. Warren did not comport with the foregoing
rules and standards, particularly as to the stick-tapping incident,
we are also bound to conclude that it did not constitute reversible
error entitling defendant to a new trial on the issue of his guilt.
Where improper prosecutorial conduct prejudices the defendant,
subverting his right to a fair trial, he is entitled to a new trial.
*Britt*, 288 N.C. at 712, 220 S.E.2d at 292; *State v. Phillips*, 240
N.C. 516, 529, 82 S.E.2d 762, 771 (1954) (repeated and flagrant
violations of rules governing cross-examination require reversal).
Where there is no reasonable possibility that the misconduct af-
fected the outcome, however, the sentence imposed by the trial
court will be upheld. *State v. Whisenant*, 308 N.C. 792, 794-95,
303 S.E.2d 784, 786 (1983) (improper question asked of defense
witness regarding defendant's criminal history does not warrant
new trial where there was no reasonable possibility that the ques-
tion affected the result in light of the overwhelming evidence of
defendant's guilt); *State v. Cofield*, 77 N.C. App. 699, 703-04, 336
S.E.2d 439, 441 (1985), *rev'd on other grounds*, 320 N.C. 297, 357
S.E.2d 622 (1987), *appeal after remand*, 324 N.C. 452, 379 S.E.2d
834 (1989) (prosecutor's improper questions did not warrant new
trial due to trial court's prompt action and to question's lack of
inflammatory impact); *State v. Heath*, 25 N.C. App. 71, 72-73, 212

S.E.2d 400, 401 (1975) (question of defendant by prosecutor relating to lie detector test did not warrant new trial since the question did not affect outcome).

Here we think the prosecutor's conduct during the cross-examination of Dr. Warren had little, if anything, to do with the outcome of the case. The transcript reveals that the trial judge was actively overseeing the cross-examination of Dr. Warren in an effort to "rein-in" the prosecutor's overzealousness. For the most part, the judge succeeded. He frequently and properly sustained defendant's objections to unseemly prosecutorial remarks to the psychologist. Furthermore, despite the prosecutor's barrage of questions and comments directed at impugning his credibility and entertaining the jury, Dr. Warren maintained his composure and in some instances succeeded in bolstering his testimony. The substance of Dr. Warren's testimony thus appears largely unharmed by the prosecutor's conduct. No inherently prejudicial information came before the jury. Dr. Rose, whose cross-examination by the prosecutor is not the subject of complaint, gave testimony which was essentially the same as that of Dr. Warren. For all these reasons, we conclude the improper conduct of the prosecutor during the cross-examination of Dr. Warren is not cause for a new trial on defendant's guilt. *Compare State v. Britt*, 288 N.C. at 707-08, 712, 220 S.E.2d at 289, 292 (improper prosecutor's cross-examination entitled defendant to a new trial because it revealed to jury that defendant previously had been sentenced to death).

D.

[5] By his fourth assignment of error, defendant contends the trial court erred in its charge to the jury by giving an incomplete and inaccurate instruction on the law of diminished capacity. Although the trial court gave a diminished capacity instruction with regard to defendant's marijuana use on the night of the murder, defendant argues the trial court also should have given an instruction with regard to his mental disabilities as bearing on his ability to form the specific intent to kill at the actual time of the murder. The instruction which the trial court gave at this point is as follows:

> There is evidence which tends to show that the defendant used marijuana shortly before the crimes alleged in this case. Generally, a voluntarily drugged condition is not a legal excuse for a crime. However, if you find that the defendant was under the influence of marijuana, you should consider whether this

condition affected his ability to formulate a specific intent which is required for conviction of first degree murder.

In order for you to find that defendant—in order for you to find the defendant guilty of first degree murder, you must find beyond a reasonable doubt that he had the required specific intent to commit first degree murder.

If as a result of a drugged condition even though voluntary, the defendant did not have the required specific intent, then you must not find the defendant guilty of first degree murder. The law does not require any specific intent for the defendant to be guilty of the crime of second degree murder, thus the defendant's drugged condition would have no bearing upon that determination.

Therefore, I charge that if upon considering the evidence with respect to the defendant's drugged condition you have a reasonable doubt as to whether the defendant formulated the specific intent required for the conviction of first degree murder, you will not return a verdict of guilty of first degree murder.

In *State v. Shank* this Court, expressly overruling prior cases, held that evidence of a "mental or emotional disturbance" of the defendant at the time of an alleged murder "would tend to make it less probable that he acted after deliberation." *State v. Shank*, 322 N.C. 243, 248-49, 367 S.E.2d 639, 643 (1988). *Shank* thus established the principle that evidence of a mental or emotional disturbance falling short of legal insanity might nevertheless be relevant in a homicide case on the issues of specific intent to kill and premeditation and deliberation. Applying the principle that the defendant is entitled to an instruction on "all substantial features of the case," this Court held shortly after *Shank* that it was reversible error to deny a defendant's request for an instruction on the defendant's mental condition as it related to his ability to premeditate and deliberate where such instruction was supported by the evidence. *State v. Rose*, 323 N.C. 455, 457-58, 373 S.E.2d 426, 428 (1988), *appeal after remand*, 327 N.C. 599, 398 S.E.2d 314 (1990).

*Shank* and *Rose*, therefore, establish that the instruction for which defendant now argues should have been given by the trial court. Defendant, however, did not object to the instruction as given nor did he present the trial court with any request—written or otherwise—for an instruction on defendant's mental disabilities.

Our review of this issue, therefore, is limited to whether the error in the trial court's failure to give the instruction constituted "plain error." *State v. Bronson*, 333 N.C. 67, 75, 423 S.E.2d 772, 777 (1992). Plain error is an error that is "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). The burden of demonstrating plain error is upon the defendant. *State v. Gardner*, 315 N.C. 444, 447, 340 S.E.2d 701, 705 (1986).

We are confident defendant has not shown plain error in the trial court's instruction as given.

To establish that defendant's personality disorder affected his ability to premeditate and deliberate, defendant relied on the testimony of Dr. Warren, an expert in forensic psychology.[2] Dr. Warren testified that defendant suffered from borderline personality disorder, which is characterized by "wild mood swings" and "reckless" behavior. He testified that someone with this disorder can become disorganized and impulsive, and that violent reactions are consistent with this disorder. Dr. Warren further testified that defendant had "dependent and histrionic traits," referring to defendant's dependency on others and on marijuana and to defendant's tendency to act out his feelings. In response to defense counsel's question regarding defendant's ability to form the specific intent to kill, Dr. Warren testified:

> My opinion is that—that prior to going to the house, Tommy was capable of forming specific intent. At some point, he became disorganized and fell apart and was no longer able to form that intent. He was not calm, he was not together, he was in pieces and very disorganized.

However, when describing defendant's histrionic traits, Dr. Warren testified that defendant's tendency was to "withdraw and run away." Further, when questioned as to whether the violent death of Ms. Foster is consistent with defendant's specific history, Dr. Warren admitted as follows:

---

2. Dr. Rose, defendant's other mental health expert and a psychiatrist by training, testified only that in his opinion defendant did not intend to kill the victim, not that his personality disorder rendered him incapable of such an intent. Dr. Rose's opinion was based, not on his assessment of defendant's mental deficiencies, but on defendant's statements to him and to the police.

[N]o, it's not reported not consistent with his reported history or family history or school history or any event.

. . .

No, his history as reported by his parents and by [defendant] and looking at his school records and even the mental health center records indicate that he's kind of withdrawn and shy, and there's—even his other history, there's no indication of any violence in his history.

It is clear from Dr. Warren's entire testimony that defendant's history demonstrated that, under stress or pressure, defendant's disorganization and impulsivity manifested itself in flight and withdrawal. To the detriment of defendant's argument, these statements tend to diminish the weight of Dr. Warren's opinion that, although defendant was capable of forming the specific intent to kill prior to the murder, under the stress of the confrontation with Ms. Foster defendant was "no longer able to form that intent."

Further, defendant's clear and unequivocal out-of-court confessions of a deliberate killing of the victim made to police on the morning of the murder make it improbable that the jury would have found that he was incapable of forming the specific intent to kill. In light of Dr. Warren's entire testimony and the other evidence in the case, we are satisfied that the defendant has not shown that an instruction on defendant's personality disorder as it related to his capacity to premeditate and deliberate and to form a specific intent to kill would have "probably resulted in the jury reaching a different verdict." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988). There is, therefore, no reversible error in the trial court's failure to instruct on this point.

We are cognizant of defendant's argument that applying the plain error standard of review to this error would be unfair because this Court's decision in *Rose* was published only after the verdict in his case was rendered. *Rose*, however, merely applied the principle we had earlier announced in *Shank*, a decision published several months before defendant's trial. Since it is well established that a judge is required to instruct on all substantial features of the case which are supported by the evidence, *see State v. Earnhardt*, 307 N.C. 62, 70, 296 S.E.2d 649, 654 (1982), defendant should have been aware after *Shank* that he was entitled to an instruction

STATE v. ADAMS

[335 N.C. 401 (1994)]

on mental illness as it relates to the *mens rea* elements of first degree murder. It is not unfair, therefore, to require defendant at trial either to have requested the instruction, as did the defendant in *Rose*, or to have objected to its omission, in order to preserve the trial court's error in failing to give it for review under the normal standard.

E.

[6] In his final assignment of error as to guilt phase issues, defendant contends the trial court violated his due process rights by instructing the jurors that a "reasonable doubt" was equivalent to an "honest, substantial misgiving" in contravention of the United States Supreme Court's holding in *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1990) (per curiam). Having previously addressed this exact issue in a case filed one week after oral argument in the case *sub judice, see State v. Hudson*, 331 N.C. 122, 415 S.E.2d 732 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 136, *reh'g denied*, --- U.S. ---, 122 L. Ed. 2d 762 (1993), we disagree.

The trial court instructed the jury as follows:

A reasonable doubt, members of the jury, means just that, a reasonable doubt. It is not a mere possible, fanciful or academic doubt, nor is it proof beyond a shadow of a doubt nor proof beyond all doubts, for there are few things in human existence that are beyond all doubt.

Nor it is [sic] a doubt suggested by the ingenuity of counsel or by your own mental ingenuity, not warranted by the testimony, nor is it a doubt born of a merciful inclination or disposition to permit—to permit the defendant to escape the penalty of the law. Nor is it a doubt suggested or prompted by sympathy for the defendant or those with whom he may be connected.

A reasonable doubt is a sane, rational doubt, an honest— *honest, substantial misgiving*, one based on reason and common sense, fairly arising out of some or all of the evidence that has been presented or the lack or insufficiency of that evidence, as the case may be.

Proof beyond a reasonable doubt is such proof that fully satisfies or entirely convinces you of the defendant's guilt.

(Emphasis added.) This instruction is essentially the same instruction given by the trial court considered in *Hudson. See Hudson*, 331 N.C. at 141, 415 S.E.2d at 742.

Just as did the *Hudson* defendant, defendant here contends that the trial court's use of the terms "honest, substantial misgiving" in defining reasonable doubt could have led the jurors to interpret the instruction "to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Cage*, 498 U.S. at 41, 112 L. Ed. 2d at 342. Writing for a unanimous Court in *Hudson*, Justice Meyer stated:

> Significantly, the combination of the terms found offensive by the *Cage* Court is not present here. Indeed, none of the objectionable language in *Cage*, "grave uncertainty," "actual substantial doubt," or "moral certainty," is evident in the instant jury instruction. Rather, here we are concerned merely with the phrase "substantial misgiving." Thus, like other courts that have considered this question, we conclude that the reasonable doubt instruction given here is not constitutionally unsound. *See Parker v. Alabama*, 587 So. 2d 1072, 1085 (Ala. Crim. App. 1991); *South Carolina v. Johnson*, 410 S.E.2d 547, 554 (S.C. 1991), *petition for cert. filed* (26 February 1992) (U.S. No. 91-7474) [footnote omitted].[3]

*Hudson*, 331 N.C. at 142-43, 415 S.E.2d at 742-43. We likewise hold that defendant's assignment in the instant case is without merit.

### III.

#### Sentencing Phase Issue

[7] Defendant also assigns error to the trial court's instructions to the jury during the sentencing phase of his trial. Defendant argues that the court's charge violates the principles enunciated by the United States Supreme Court in *McKoy v. North Carolina*, 494 U.S. 433, 108 L.Ed.2d 369 (1990), by requiring the jury to unanimously find mitigating circumstances before considering any of those mitigating circumstances in their deliberations on punishment. Further, defendant contends this error was not harmless and requires a new sentencing hearing. The State has conceded

---

3. The United States Supreme Court subsequently denied the *Johnson* defendant's petition for writ of certiorari. *Johnson v. South Carolina*, --- U.S. ---, 118 L. Ed. 2d 404 (1992).

both points in brief and in oral argument, and has recommended that this Court remand defendant's case for re-sentencing. We concur and order a new capital sentencing proceeding.

NO ERROR IN THE TRIAL.

DEATH SENTENCE VACATED AND REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

Justice Parker did not participate in the consideration or decision in this case.

Justice MITCHELL concurring in the result.

I concur in the result reached by the majority. I am unable to agree, however, with the apparent view of the majority that the District Attorney somehow behaved improperly or unethically if his conduct violated the Prosecution Function Standards of the American Bar Association Standards for Criminal Justice. Those standards have no force or effect in North Carolina or in the overwhelming number of jurisdictions of this nation. The District Attorneys of North Carolina—like the members of this Court—are independently elected constitutional officers who have performed their constitutionally prescribed functions for more than two centuries without officious instructions from the American Bar Association or other private organizations. I believe that our District Attorneys are quite capable of continuing to perform those functions without such assistance and that the "Prosecution Function Standards" cited by the majority should not be relied upon in this jurisdiction.