STATE OF NORTH CAROLINA v. ELMER RAY McNEILL, JR.

No. 184A96

(Filed 31 December 1998)

**1. Constitutional Law § 343 (NCI4th)— presence of defendant—preliminary swearing of prospective jurors**

Defendant had no right to be present when prospective jurors were preliminarily sworn in, oriented, and generally qualified for service by a deputy clerk in the jury assembly room prior to the time the jurors were assigned to any particular courtroom for jury service.

**2. Jury § 266 (NCI4th)— jurors preliminary sworn by clerk— not statutory violation**

The procedure whereby prospective jurors were preliminarily sworn in, oriented, and generally qualified for service by a deputy clerk in the jury assembly room did not violate the requirement of N.C.G.S. § 9-14 that the jury be sworn "at the

beginning of court" since that phrase refers to the beginning of the term of court rather than to the beginning of an individual trial.

### 3. Jury § 92 (NCI4th)— voir dire—oath of jurors

Defendant's right to a fair and impartial trial was not violated by his trial before a jury that had been selected during a *voir dire* process that did not require prospective jurors to take an oath that they would "tell the truth" where the record reflects that the jurors took the oath prescribed by N.C.G.S. § 9-14 prior to trial in this case.

### 4. Evidence and Witnesses § 1240 (NCI4th)— statements to police—absence of Miranda warnings—defendant not in custody

The trial court did not err by denying defendant's motion to suppress his first and second statements to the police because he had not been advised of his *Miranda* rights where defendant voluntarily drove to the police department for questioning as a potential witness; the first interview lasted approximately thirty minutes, was not confrontational, and did not produce any incriminating statements by defendant; the second interview occurred a short time later after defendant voluntarily agreed to answer a few more questions, and defendant was not restrained in any way and did not ask to leave; and the trial court correctly determined that defendant was not in custody at the time his first two statements were given to the police.

### 5. Constitutional Law § 344.1 (NCI4th)— unrecorded bench conferences—absence of defendant—not constitutional violation

Defendant's federal and state constitutional rights were not violated in this capital trial when the trial court conducted numerous bench conferences out of his presence and without providing a record of the substance of such conferences where defendant was represented by counsel at each of the bench conferences; defendant was present in the courtroom and was in a position to observe the context and to inquire of his attorneys as to the nature and substance of each one of the conferences; and defendant has failed to show the usefulness of his presence or that his presence at the bench would have had a reasonably substantial relation to his opportunity to defend.

STATE v. McNEILL

[349 N.C. 634 (1998)]

**6. Criminal Law § 545 (NCI4th Rev.)— State's witness—challenge to defendant to testify—mistrial denied**

The trial court did not err or abuse its discretion in denying defendant's motion for a mistrial in this capital case after defendant's older brother, testifying for the State, challenged defendant to take the stand in his own defense where the trial court found that the unsolicited comment was simply blurted out by the witness and took everyone by surprise; the prosecutor responded immediately to avoid further comment; and the trial court instructed the jury not to consider the comment "in any way whatsoever."

**7. Evidence and Witnesses § 2908 (NCI4th)— statements volunteered by witness—opening of door by defendant**

The trial court did not err by refusing to strike statements by defendant's brother in this prosecution for two first-degree murders that defendant's evidence was a "circus" and that the "victims of this heinous crime deserve more than what they've been getting" where defendant opened the door to this testimony by impugning the character of the witness on cross-examination by implying that the witness had a sexual relationship with the wife of defendant's other brother and that the witness was going to profit by writing a book about the murders.

**8. Indigent Persons § 24 (NCI4th)— forensic crime-scene expert—funds denied**

The trial court did not err in denying defendant's motions for funds to employ a forensic crime-scene expert in this prosecution for two first-degree murders where the trial court had granted defendant's motions for funds to hire a private investigator, a firearms expert, a fingerprint expert, and an audiologist; and the trial court properly concluded that defense counsel had not made a threshold showing of need for a crime-scene expert or that such assistance was necessary for defendant to receive effective assistance of counsel and a fair trial.

**9. Evidence and Witnesses § 668 (NCI4th)— exhibits not admitted—references by witnesses—refusal to strike—not plain error**

Assuming *arguendo* that the plain error rule applies to the failure to strike the testimony of witnesses, the trial court did not commit plain error by failing to strike the testimony of several witnesses referring to two exhibits, a Ruger revolver and a Ruger

STATE v. McNEILL

[349 N.C. 634 (1998)]

firearm box, that had not been admitted into evidence where the substance of the testimony of these witnesses could have been obtained without the exhibits.

10. **Appeal and Error § 370 (NCI4th)— judicial settlement of record on appeal—allowing evidence—absence of defendant—not error or constitutional violation**

The trial court did not err and violate defendant's right to due process by actively soliciting and allowing the presentation of evidence at a hearing to settle the record on appeal without notice to defendant or his counsel where the trial court conducted a hearing in open court upon the record with defense counsel and the prosecutor present; defendant's presence was not required at a hearing to settle the record on appeal; and defendant has failed to show how he was prejudiced by not receiving advance notice since his counsel was present and fully examined the deputy clerk who testified and could have asked her to find and bring any necessary documents to the courtroom.

11. **Appeal and Error § 370 (NCI4th)— judicial settlement of record on appeal—ex parte communication with prosecutor—absence of prejudice**

Assuming *arguendo* that the trial court's comments and a deputy clerk's testimony during a conference to judicially settle the record on appeal showed the trial court's participation in an *ex parte* communication with the prosecutor, such *ex parte* communication would not be improper because it related only to the administrative functioning of the judicial system, and it appears that the trial court was only being careful to assure that the appellate court would have a complete record to properly resolve issues raised by defendant in the record on appeal.

12. **Criminal Law § 1349 (NCI4th Rev.)— capital sentencing—mitigating circumstances—use of "may" in instructions**

The trial court's use of the word "may" in its instructions in a capital sentencing proceeding on Issues Three and Four did not make consideration of established mitigating circumstances discretionary.

13. **Criminal Law § 1402 (NCI4th Rev.)— death penalty not disproportionate**

Sentences of death imposed upon defendant for two first-degree murders were not excessive or disproportionate where

STATE v. McNEILL

[349 N.C. 634 (1998)]

defendant was convicted of both counts of first-degree murder under the theory of premeditation and deliberation; defendant was an integral part of a calculated plan to rob a store and to kill whomever was closing the store to eliminate them as witnesses; defendant procured the murder weapon and shot each of the victims twice in the head, at close range, with a revolver; and the jury found as aggravating circumstances for each murder that the murder was committed for the purpose of avoiding and preventing a lawful arrest, the murder was committed for pecuniary gain, and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons.

Justice Wynn did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Stephens (Donald W.), J., on 9 April 1996 in Superior Court, Wake County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments was allowed 29 October 1996. Heard in the Supreme Court 29 May 1998.

*Michael F. Easley, Attorney General, by John H. Watters, Special Deputy Attorney General, for the State.*

*Elizabeth G. McCrodden for defendant-appellant.*

FRYE, Justice.

In a capital trial, defendant was convicted by a jury of first-degree murder of Robert Michael Truelove and John David Ray on the basis of premeditation and deliberation and under the felony murder rule. The jury also found defendant guilty of conspiracy to commit armed robbery and robbery with a firearm. In a capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court imposed a sentence of death as to each murder. Defendant was also sentenced to imprisonment for forty years for the robbery with a dangerous weapon conviction, and ten years for conspiracy to commit armed robbery.

Defendant makes thirteen arguments on appeal to this Court. For the reasons discussed herein, we conclude that defendant's trial and

capital sentencing proceeding were free of prejudicial error and that the death sentences are not disproportionate. Accordingly, we uphold defendant's convictions and sentences.

The State's evidence presented at trial tended to show the following facts and circumstances. Late in the evening of 18 September 1993, the wife of victim John Ray arrived at the Food Lion store located at the corner of Strickland Road and Six Forks Road in Raleigh to pick up her husband. After driving over the parcel pickup bell, she waited for her husband. When he did not emerge, she knocked on the front door. When no one came to the front door, she drove around to the back and pressed the night buzzer for truck deliveries. Again no one responded. Mrs. Ray then called 911.

Raleigh police officer Mike Liptak responded to Mrs. Ray's call, arriving at the Food Lion store close to midnight. Officer Liptak called the assistant manager of the Food Lion store, Mr. Lindberg. Through a front window, Officer Liptak observed tills lying on the floor and an open safe. He then proceeded to the back of the store, where he saw an open door but did not enter. Other officers arrived, and the scene was secured. When Lindberg arrived, he and three officers entered the building and found the bodies of two men. One victim, John Ray, was in the meat locker, and the other, Mike Truelove, was in the back of the store. Both men had been shot.

Ms. Flournoy, the store manager, estimated that there was approximately $2,300 in a safe bag missing from the store. Robert McNeill, one of defendant's brothers, was an employee of Food Lion and was immediately a suspect. On 23 September, defendant was questioned because he was part of his brother's alibi.

Chris Thornhill, a friend of defendant, testified that defendant wanted him to come to North Carolina to find work. During a phone conversation, defendant and Thornhill discussed the move, and defendant inquired whether Thornhill still had a .357 revolver. On the night of 17 September, defendant went to South Carolina to get Thornhill. The next day, defendant and Thornhill drove to Raleigh. Thornhill had purchased from Zane Bryant a .357 Magnum revolver, which he showed to defendant on the way to Raleigh. Defendant and Thornhill checked into the Innkeeper Motel between seven and eight o'clock Sunday night, 18 September. Defendant then took Thornhill's revolver and left the motel. When defendant returned to the motel around midnight, he appeared dazed. Defendant told Thornhill that he had sold the gun for three hundred dollars to a man who approached

him at a gas station and that the man had then hit him on the ear. Defendant was having trouble hearing. When defendant and Thornhill arrived in Raleigh, defendant had about one hundred dollars. According to Thornhill's testimony, the next day, defendant had a vinyl bag containing about eight hundred dollars in cash and a thick roll of one-dollar bills.

On 23 September 1993, Sergeant Williams of the Raleigh Police Department obtained from Zane Bryant an empty Ruger Blackhawk .357 Magnum revolver box and a partial box of shells. Bryant testified that in early September he had sold Thornhill the revolver which came in the box and that at the time of the sale the revolver would have been loaded from the opened box of shells.

Special Agent Gavin with the FBI, formerly with the SBI, testified as an expert in forensic firearms. In his opinion, the bullet jackets recovered from the bodies of the victims were all fired from the same firearm, either a Ruger or a Rohm. Bullets recovered from the crime scene were of the same type as contained in the box of ammunition obtained from Bryant. Small gun parts also recovered from the scene were identified as parts of a Ruger single-action revolver.

A latent-fingerprint examiner was able to identify one half of a left palm print belonging to defendant on an exterior rear door of the Food Lion store. Ms. Muse, a Food Lion employee, remembered defendant had been to the store to meet his brother on 12 September 1993. There was conflicting evidence as to how often the doors were cleaned.

Experts in acoustics and audiology conducted sound tests by firing a new Ruger Blackhawk in the Food Lion meat cooler and testified that shots fired from that revolver in the cooler would have caused the shooter to experience significant temporary hearing loss.

Michael McNeill, the older brother of Robert and defendant, testified that, in February 1994, defendant admitted to him that he had killed both men. Michael also testified that he believed defendant was covering up for Robert, who, unlike defendant, was apt to see what he could get away with. Michael also believed defendant was covering up for Thornhill. Michael further testified that he did not want to believe defendant committed the murders, but "he hasn't told me any different."

Defendant testified in his own behalf. He stated that he moved to North Carolina at Robert's invitation and planned to go to college. He

did not get along with Robert's wife, so he talked Thornhill into moving to Raleigh and sharing an apartment with him. Robert had told defendant he needed a gun because someone was harassing his wife. Defendant testified that, after picking up Thornhill in South Carolina and driving back to Raleigh, he called Robert to arrange picking up his clothes and savings. He then went to the Food Lion store, arriving about 10:00 p.m., and waited for Robert. Robert and defendant then drove to Taco Bell in separate cars. There, defendant showed Robert the revolver, and Robert purchased it from him for three hundred dollars. Defendant then drove to Robert's house to wait for Robert, so he could get his clothes and money. When Robert arrived, he was carrying his shirt. Robert wanted defendant to tell Thornhill that he and defendant had been together the entire evening and not to tell Thornhill that he had sold him the gun. Defendant agreed, retrieved his belongings, and left. Defendant testified that he maintained his story to protect Robert, even after hearing about the Food Lion murders. He denied involvement in the murders and denied confessing to his brother Michael.

Craig Stover, formerly a co-employee of Robert McNeill at the Food Lion store at Tower Shopping Center, testified about his involvement with Robert in a robbery of that store in May 1993. He testified that Robert discussed a second robbery and that Robert had talked about killing his manager. Several Food Lion employees at both stores testified that Robert was unable to get along with his co-workers at either store. He had been suspended for two weeks and eventually transferred.

Mr. Bissette, a retired member of the task force which investigated the murders, testified that defendant had cooperated with police and gave permission for a search of his vehicle. He testified that four days after the murders, defendant had no problems with his hearing. Detective Harrell of the Raleigh Police Department testified that Thornhill had given police two different stories.

An expert in otolaryngology testified that there is no way to distinguish trauma-induced hearing loss, such as that from being struck, from acoustically induced hearing loss. He further testified that alcohol can produce significant temporary hearing loss as well.

Robert McNeill testified, for the most part invoking his Fifth Amendment rights. However, he contended that defendant was innocent.

STATE v. McNEILL

[349 N.C. 634 (1998)]

The trial court denied defendant's motions to dismiss made at the close of the State's evidence and again at the close of all the evidence. The jury returned verdicts of guilty of two counts of first-degree murder, conspiracy to commit armed robbery, and robbery with a firearm.

At defendant's capital sentencing proceeding, the State presented no additional evidence. Defendant presented evidence tending to show his good character.

On appeal to this Court, defendant makes thirteen arguments based on nineteen assignments of error. He contends that the trial court committed numerous errors entitling him to dismissal of the charges against him or, in the alternative, a new trial or new capital sentencing proceeding. We find no prejudicial error entitling defendant to a dismissal, new trial, or new capital sentencing proceeding.

[1] In his first argument, based on three assignments of error, defendant contends that the trial court erred "in allowing the case to be tried before a jury that had not been sworn in open court with due solemnity before defendant and his counsel and that had been sworn before the beginning of court." We disagree.

This Court considered similar challenges based on a defendant's constitutional right to be present at all stages of his trial in *State v. Workman*, 344 N.C. 482, 476 S.E.2d 301 (1996). In that case, the defendant argued that his right to be present was violated because prospective jurors were preliminarily sworn, oriented, and generally qualified for service by a deputy clerk in the jury assembly room outside of the defendant's presence. This Court concluded that Workman had no right to be present because his capital trial had not yet commenced. *Id.* at 498, 476 S.E.2d at 310. This Court has also noted that a defendant's right to presence does not include the right to be present during preliminary handling of the jury venire before the defendant's own case has been called. *State v. Rannels*, 333 N.C. 644, 430 S.E.2d 254 (1993).

In the instant case, the record reflects that prospective jurors were sworn in the jury pool room by a deputy clerk of superior court after a juror orientation by that clerk, but prior to the time the jurors were assigned to any particular courtroom for jury service. These jurors were subject to assignment in any one of six superior courts in session as well as any number of district courts. We conclude that our decisions in *Workman* and *Rannels* control here. Defendant has no

right to be present where prospective jurors are preliminarily sworn in, oriented, and generally qualified for service by a deputy clerk in the jury assembly room.

[2] Defendant further contends under this argument that this procedure violated his statutory rights under N.C.G.S. § 9-14 to have the jury sworn "at the beginning of court." We disagree.

N.C.G.S. § 9-14 provides in pertinent part:

> The clerk shall, at the beginning of court, swear all jurors who have not been selected as grand jurors. Each juror shall swear or affirm that he will truthfully and without prejudice or partiality try all issues in criminal or civil actions that come before him and render true verdicts according to the evidence.

N.C.G.S. § 9-14 (1997).

The State contends, and we agree, that the phrase "at the beginning of court," as it applies to the swearing of prospective jurors, refers to the beginning of the term of court as opposed to the beginning of an individual trial, which may be civil or criminal. This interpretation comports with the oath given prospective jurors to "try all issues in criminal and civil actions" that come before a particular juror who is selected to serve. Accordingly, we reject defendant's first argument.

[3] In his second argument, defendant seeks a new trial on the grounds that the trial court erred when it allowed his case to be tried before a jury that had been selected during a *voir dire* process that did not require prospective jurors to take an oath that they would "tell the truth." Defendant argues that the failure of the State to administer such an oath taints the jury selection process and violates defendant's Sixth Amendment right to a fair and impartial jury.

As we indicated earlier, N.C.G.S. § 9-14 requires that jurors "swear or affirm that [they] will truthfully and without prejudice or partiality try all issues in criminal or civil actions that come before [them] and render true verdicts according to the evidence." The record reflects that the jurors took the prescribed oath prior to trial in this case. That oath required that they "truthfully" try all issues and "render true verdicts according to the evidence." There is no indication that the trial court failed to perform any duty required of it in the swearing of the venire. Furthermore, defendant has failed to show that any juror ultimately selected in his case was in any way unquali-

fied to sit or that he was in any way prejudiced because jurors were not required, during *voir dire*, to take an additional oath to "tell the truth." Accordingly, we reject defendant's second argument.

[4] Defendant's third argument asserts that the trial court erred in denying defendant's motion to suppress statements he made to police on 23 September 1993. Defendant contends that this denial violated his Fifth Amendment rights under the United States Constitution. Defendant argues that he was in custody when he gave his first and second statement, and that he had not been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). We find no error.

This Court has consistently held that the necessity of a *Miranda* warning and waiver applies only under circumstances where a defendant is subject to custodial interrogation. *See State v. Gaines*, 345 N.C. 647, 661, 483 S.E.2d 396, 404, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997). In order to determine whether a defendant is in custody for *Miranda* purposes, the test is whether a reasonable person in the suspect's position would feel free to leave or would feel compelled to stay. *See State v. Hicks*, 333 N.C. 467, 478, 428 S.E.2d 167, 173 (1993). An appellate court must examine the totality of circumstances surrounding the interrogation, but "the definitive inquiry is whether there was a formal arrest or a restraint on the freedom of movement of the degree associated with a formal arrest." *Gaines*, 345 N.C. at 662, 483 S.E.2d at 405.

In the instant case, it is undisputed that police questioned defendant during three separate interviews without benefit of *Miranda* warnings. However, the record also shows that defendant voluntarily drove to the Raleigh Police Department for questioning as a potential witness. The trial court found that the first interview lasted approximately thirty minutes, was not confrontational, and did not produce any incriminating statements by defendant. The second interview occurred a short time later, at approximately 7:45 p.m., after defendant voluntarily agreed to answer a few more questions. Defendant was not restrained in any way and did not ask to leave. The second interview ended at approximately 8:07 p.m. The third interview followed the voluntary fingerprinting of defendant and search of defendant's truck at approximately 9:50 p.m.

The trial court made extensive findings of fact based on uncontroverted evidence. The trial court found that, during the first two interviews at the police station, defendant's freedom of action was

not restrained in any way, defendant was not impaired, he was not coerced or threatened, and he was cooperative and willing to talk at all times. However, the trial court also found that after 9:50 p.m., a reasonable person would probably have concluded that he was no longer free to leave and that his freedom was being restrained in a significant way. No explanation was given to defendant regarding the need for a third interview by yet another officer.

The trial court concluded that the first two interviews did not constitute custodial interrogation and that defendant's statements were thus admissible, but that the third statement was not admissible because defendant's freedom was restricted and he had neither been advised of nor knowingly waived his *Miranda* rights. After reviewing the totality of the circumstances surrounding defendant's questioning on 23 September 1993, we conclude that the trial court correctly determined that defendant was not in custody at the time his first two statements were given to police. Accordingly, we hold that the trial court did not err in denying defendant's motion to suppress his first and second statements to police.

**[5]** In his fourth argument, defendant contends that his federal and state constitutional rights were violated when the trial court conducted numerous bench conferences out of his presence and without providing a record of the substance of such conferences. Defendant acknowledges this Court's decision in *State v. Buchanan*, 330 N.C. 202, 410 S.E.2d 832 (1991), but attempts to distinguish this case from *Buchanan*. In *Buchanan*, we rejected defendant's federal and state constitutional challenges to such bench conferences after a careful review of cases by this Court and the federal courts.

After a careful review of the eighteen instances identified by defendant in which the trial court conferred with trial counsel in this case, we conclude that there is no error under *Buchanan*. We note first that the holding and underlying rationale of *Buchanan* have been repeatedly reaffirmed by this Court. *See, e.g., State v. Tyler*, 346 N.C. 187, 485 S.E.2d 599, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 411 (1997); *State v. Speller*, 345 N.C. 600, 481 S.E.2d 284 (1997); *State v. Larrimore*, 340 N.C. 119, 456 S.E.2d 789 (1995). Nevertheless, *Buchanan* should not be read as a wholesale approval of unrecorded bench conferences in capital cases. As we said in *Buchanan*,

If . . . the subject matter of the conference implicates the defendant's confrontation rights, or is such that the defendant's presence would have a reasonably substantial relation to his oppor-

tunity to defend, the defendant would have a constitutional right to be present.

*Buchanan*, 330 N.C. at 223-24, 410 S.E.2d at 845.

Defendant was represented by counsel at each of the unrecorded bench conferences. Defendant was present in the courtroom and was in a position to observe the context and to inquire of his attorneys as to the nature and substance of each one of the conferences. Despite the fact that defendant was not present at the bench, he had, through his counsel, the opportunity to raise, for the record, any matter to which he took exception. Moreover, defendant has failed to show the usefulness of his presence or that his presence at the bench would have had a reasonably substantial relation to his opportunity to defend. Accordingly, we reject defendant's fourth argument.

[6] In his fifth argument, defendant contends that the trial court erred in denying his motion for mistrial after defendant's older brother, Michael McNeill, testifying for the State, challenged defendant to take the stand in his own defense. Defendant argues that despite the trial judge's admonition to the jury not to consider the remark, the admonition came too late, defendant was compelled to testify in his own behalf, and this compulsion violated his Fifth Amendment right to remain silent. He also argues that the right to remain silent is so compelling that the trial court's denial of a mistrial amounted to an abuse of discretion.

N.C.G.S. § 15A-1061 provides, in pertinent part:

> Upon motion of a defendant or with his concurrence the judge may declare a mistrial at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case. If there are two or more defendants, the mistrial may not be declared as to a defendant who does not make or join in the motion.

N.C.G.S. § 15A-1061 (1997). In *State v. King*, 343 N.C. 29, 468 S.E.2d 232 (1996), we said: "It is well settled that a motion for a mistrial and the determination of whether defendant's case has been irreparably and substantially prejudiced is within the trial court's sound discretion." *Id.* at 44, 468 S.E.2d at 242.

The gravamen of Michael McNeill's testimony was that after reading defendant's statement to the police, he began to question whether his brother was in fact involved in the murders. Michael testified that he questioned defendant, who admitted being there with their other brother, Robert. In addition, he then testified that defendant admitted that he actually killed the two Food Lion employees. The portion of Michael's testimony at issue here is as follows:

[PROSECUTOR]: Mr. McNeill, why did you wait until the Fall of 1995 to contact me?

A. I had serious doubts about what my brother had told me.

[PROSECUTOR]: Your brother, Ray?

A. Yes. Particularly the part about being the triggerman. I thought he might be covering up for someone because Ray has a warped sense of loyalty.

*And, Ray, if you—if you lied to me, you need to get your scrawny butt on the stand and—*

[PROSECUTOR]: Mike, Mike that's okay.

THE COURT: No, no. Let's don't—Just answer questions, please.

[PROSECUTOR]: It's okay.

THE COURT: Ladies and gentlemen, do not consider that last remark in any way whatsoever.

(Emphasis added.)

While Michael's challenge to defendant was improper, we conclude that nothing in the record reflects that the prosecutor's questions elicited his comment. When considering defendant's motion for a mistrial, the trial court found that the unsolicited comment was simply blurted out by the witness and took everyone by surprise. The prosecutor responded immediately to avoid further comment, and the trial court, acting *ex mero motu*, told the jury not to consider the comment "in any way whatsoever." The trial judge denied defendant's motion for mistrial in light of his curative instruction and the fact that he found no prejudice to defendant. The trial court further offered to instruct the jury that defendant had no burden of proof and no obligation to testify and that, under the law, his decision not to testify could not be held against him. The trial court also offered to ask each

juror if he or she could abide by that law. Defendant declined the trial court's offer.

In this case, neither the trial court nor the prosecutor made any comments referring to defendant's right to remain silent. In fact, the prosecutor attempted to stop the witness from blurting out such comments. Any potential prejudice was cured by the trial court's instruction to the jury not to consider the remark. The court took substantial remedial precautions to insure that defendant continued to receive a fair trial. We conclude that the trial court did not err or abuse its discretion in denying defendant's motion for mistrial.

**[7]** In his sixth argument, defendant contends that the trial court erred by refusing to strike statements by Michael McNeill that defendant's evidence was a "circus" and by overruling defendant's objections to the same witness' statement that the "victims of this heinous crime deserve more than what they've been getting." Defendant argues that these statements further compounded the prejudice of his earlier challenge to defendant to testify and that failure by the trial court to control these remarks constituted reversible error. We disagree.

The record reflects that defendant, through his attorneys, had impugned the motives of his brother Michael for coming forward and testifying on behalf of the State. The implication of the cross-examination by defense counsel was that Michael McNeill had a sexual relationship with Tamara McNeill, the wife of defendant's brother Robert, and was therefore biased against Robert and defendant. The record shows that defense counsel had previously made this very argument out of the jury's presence. Ultimately, counsel was permitted to ask Michael whether he had a sexual relationship with Tamara McNeill prior to his coming forward with this information to the district attorney. The witness denied any such relationship. Counsel also intimated through his cross-examination that Michael was going to profit by writing a book about the murders.

The record reflects that on redirect examination, the following exchange took place:

[PROSECUTOR]: Mr. McNeill, Mr. Ellinger asked you a question about whether or not you had aspirations to be a writer. And you said you've thought about it at times. Why are you coming in here into this courtroom and telling these people over here the things that you're telling them?

STATE v. McNEILL

[349 N.C. 634 (1998)]

A. Because it's the truth. Because, as I stated before, I mean, this is not a joke. It's not a game. After watching this circus for the last two days —

[Defense Counsel]: Objection.

[Defense Counsel]: Motion to strike.

The Court: Overruled.

Go ahead.

A. I just—there needs to be—the truth needs to come out and there needs to be some justice. The—the victims of this heinous crime deserve more than what they've been getting.

[Defense Counsel]: Objection.

The Court: Overruled.

Go to your next question.

[Prosecutor]: Mr. McNeill, did you have any motivation for any kind of personal gain for you personally, Mike McNeill, that motivated you to come forward with this information and to come forward in this courtroom?

A. No.

[Prosecutor]: That's all, Your Honor.

"The law 'wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself.'" *State v. Warren*, 347 N.C. 309, 317, 492 S.E.2d 609, 613 (1997) (quoting *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981)), *cert. denied,* —— U.S. ——, 140 L. Ed. 2d 818 (1998). Defendant opened the door to the witness' response by impugning his character through his line of cross-examination. We conclude that Michael McNeill's responses were in explanation of or in rebuttal to evidence elicited by defendant. The trial court did not err in denying defendant's motion to strike these statements.

[8] In his seventh argument, defendant contends that the trial court erred in denying his motion for funds to employ a forensic crime-scene expert. Defendant argues that he needed a generalist who could review the mass of circumstantial physical evidence, some of which was exculpatory. He contends that denial of this motion violated his due process rights. We disagree.

In order to receive state-funded expert assistance, an indigent defendant must make "a particularized showing that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case." *State v. Parks*, 331 N.C. 649, 656, 417 S.E.2d 467, 471 (1992); *see also* N.C.G.S. § 7A-450(b) (1995). Furthermore, "the State is not required by law to finance a fishing expedition for the defendant in the vain hope that 'something' will turn up." *State v. Alford*, 298 N.C. 465, 469, 259 S.E.2d 242, 245 (1979). "Mere hope or suspicion that such evidence is available will not suffice." *State v. Tatum*, 291 N.C. 73, 82, 229 S.E.2d 562, 568 (1976).

In the instant case, defendant filed a number of motions requesting funds to hire experts to assist in his defense. The trial court granted defendant's motions for a private investigator, a firearms expert, a fingerprint expert, and an audiologist. After a hearing, with defendant and his counsel present, the court concluded that defense counsel had not made a threshold showing of need for a crime-scene expert or that such assistance was necessary for defendant to receive effective assistance of counsel and a fair trial.

Defendant makes the argument that at the time the trial court heard the motion for funds to hire a forensic crime-scene expert, there was little other evidence but that contained in the Food Lion store. Defendant contends that evidence was circumstantial and in need of interpretation. However, while a forensic crime-scene expert may have been of some assistance to defense counsel in preparing the case, we agree with the trial court that this was not an adequate showing of particularized necessity to require the State to provide funds for such an expert. Accordingly, the trial court did not err in denying this motion.

[9] In his eighth argument, defendant contends that the trial court committed plain error in not striking *ex mero motu* the testimony of various witnesses pertaining to State's Exhibits 76 and 77. State's Exhibit 77 was a Ruger Blackhawk .357 Magnum revolver purchased by the State for demonstration purposes, and Exhibit 76 was the Ruger firearm box. Although the exhibits were never admitted into evidence, several witnesses referred to them during testimony, and one witness used Exhibit 77 to demonstrate the workings of a Ruger revolver. Defendant neither objected to the use of the exhibits nor moved to strike the testimony of these witnesses. Nevertheless, defendant now contends that he is entitled to a new trial under the

plain error rule because the trial judge did not strike the testimony of the witnesses regarding these exhibits. We disagree.

The plain error rule applies in the exceptional case where, after reviewing the entire record, it can be said that the claimed error is so fundamental that justice could not have been done. *See State v. Weathers*, 339 N.C. 441, 450, 451 S.E.2d 266, 271 (1994); *see also State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). Assuming *arguendo* that the plain error rule applies to the failure to strike the testimony of witnesses, we reject defendant's contention here. While the exhibits were used in soliciting testimony, the substance of the testimony could have been obtained without the exhibits. For example, the identification of the gun and box by law enforcement officers simply authenticated the purchase of the weapon by the State. The identification of the gun as being similar to a gun previously owned or seen by other witnesses was merely corroborative. The only significant use of the gun in the courtroom was to demonstrate the workings of a Ruger revolver. The witness could have used one of the State's exhibits constituting a working diagram of the Ruger revolver. Clearly, the use of these exhibits to illustrate testimony does not amount to fundamental error justifying a new trial. *Cf. State v. Cannon*, 341 N.C. 79, 459 S.E.2d 238 (1995) (holding that there was no prejudicial error when the jury was permitted to review a diagram which was never admitted into evidence).

In his ninth argument, defendant contends that the trial court erred in denying his motions to dismiss. Defendant concedes that he bases his argument concerning the propriety of the trial court's denial of his motion to dismiss on the failure of the trial court to strike *incompetent* evidence, to wit, the testimony concerning State's Exhibits 76 and 77. Since we have rejected defendant's contention that the trial court committed plain error by failing *ex mero motu* to strike the testimony concerning these exhibits, we also reject defendant's ninth argument.

**[10]** In his tenth argument, defendant contends that the trial court erred and violated his right to due process by actively soliciting and allowing the presentation of evidence at a judicial settlement conference, without notice to defendant or his counsel. We disagree.

Under Rule 11(c) of the North Carolina Rules of Appellate Procedure, if the parties are unable to agree on the record on appeal, it becomes the duty of the trial judge to settle the record. In the instant case, the parties were unable to agree on the record on

appeal, and the trial judge conducted a hearing in open court upon the record with defense counsel and the prosecutor present. Over defendant's objection, the court heard testimony from Deputy Clerk Helen Sewell regarding the method and manner by which the jurors in this case were sworn by her prior to defendant's case being called for trial. Defense counsel objected on the basis that defendant was not present. We find no error. First, defendant's presence is not required at a hearing to settle the record on appeal. Second, defendant has failed to show how he was prejudiced by not receiving advance notice, since his counsel was present and fully examined Ms. Sewell and could have, but did not during the course of the hearing, ask her to find and bring any necessary documents to the courtroom. Furthermore, defendant has not argued that he was prevented from presenting evidence at the hearing.

[11] In a related eleventh argument, defendant contends that the trial court erred in participating in *ex parte* communications with the prosecutor prior to the judicial settlement conference. Defendant bases his assertions on the deputy clerk's testimony that the prosecutor had asked her to testify and two separate comments made by the trial court during the judicial settlement conference. The trial court first commented:

> THE COURT: Since there appears to be some question in the record with regard to the way it was proposed on behalf of the defendant concerning the oath that the jurors took in this case, and the record clearly indicates that they did take an oath at page 651, I believe, of the record prior to impanelment, both the Court and the Clerk noted that the jurors had been sworn, they were impaneled to try the issues in the case. However, I've ask that the Jury Clerk be available to testify with regard to the circumstances under which the jurors were sworn, since they were not sworn in open court in the presence of the defendant, and I'll allow the State to proceed with calling Helen Sewell.

A later comment by the court during the same judicial settlement conference is as follows:

> THE COURT: Well, I don't believe I would have approved this record, . . . if there had been some question in the record as to whether or not the jurors had been sworn in the case when the defendant was sentenced to death. I would hope you would have anticipated that the Court might make some inquiry as to clarifying that matter.

STATE v. McNEILL

[349 N.C. 634 (1998)]

Assuming, *arguendo*, that the judge's comments and the deputy clerk's testimony somehow showed an *ex parte* communication with the prosecutor, such *ex parte* communication relates only to the administrative functioning of the judicial system and would not be improper. At most, it appears that the trial judge was being careful to assure that this Court have a complete record to properly resolve issues raised by defendant in the record on appeal.

## PRESERVATION ISSUE

[12] Defendant raises an additional argument that the trial court erred in using the word "may" in its instructions in sentencing Issues Three and Four. Defendant's specific argument is that the use of the word "may" in the instructions makes consideration of established mitigating circumstances discretionary. This argument has been repeatedly rejected by this Court. *See State v. Geddie*, 345 N.C. 73, 478 S.E.2d 146 (1996), *cert. denied*, —— U.S.——, 139 L. Ed. 2d 43 (1997); *State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996); *State v. Basden*, 339 N.C. 288, 451 S.E.2d 238 (1994), *cert. denied*, 515 U.S. 1152, 132 L. Ed. 2d 845 (1995); *State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Defendant raises this issue for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving it for any possible further judicial review of this case. We have carefully considered defendant's arguments on this issue and find no compelling reason to depart from our prior holdings. Accordingly, we reject this argument.

## PROPORTIONALITY REVIEW

[13] Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. It is our duty in this regard to ascertain: (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1997).

STATE v. McNEILL

[349 N.C. 634 (1998)]

In this case, as to each murder, the aggravating circumstances submitted to and found by the jury were: (1) the murder was committed for the purpose of avoiding and preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4); (2) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (3) the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). After thoroughly examining the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstances submitted to and found by the jury. Further, we find no indication that the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

In our proportionality review, it is proper to compare the present case with cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Distinguishing features of the instant case are: (1) defendant was convicted of two counts of first-degree murder under the theory of premeditation and deliberation; (2) defendant was an integral part of a calculated plan to rob a store and to kill whomever was closing the store to eliminate them as witnesses; (3) defendant procured the murder weapon and shot each of the victims twice in the head, at close range, with a .357 Magnum revolver.

Defendant argues to this Court that his sentences of death are disproportionate under the circumstances of these crimes and considering this particular defendant. Defendant notes that in the trial of

his brother and codefendant, Robert McNeill, the jury found the same three aggravating circumstances as in defendant's case, plus a fourth circumstance of having previously been convicted of a felony involving the threat of violence to another person, yet Robert McNeill received life sentences for his participation in the two murders. Defendant also points to testimony that indicated Robert McNeill was the motivating factor behind the murders and that but for Robert McNeill, defendant would not have been at the Food Lion or been involved in the crime at all. Finally, defendant urges this Court to consider the fact that he was the younger brother, that Robert McNeill was described as "greedy" and had been involved in criminal activity before, and that defendant was known for his blind loyalty, even to those who would get him in trouble.

We conclude, however, that the circumstances of the crimes and the attributes of defendant do not render defendant's sentences of death disproportionate.

The sentencing of defendant's brother Robert to life imprisonment for the same crimes also does not require a determination that defendant's sentences were disproportionate. We note that the fact that a defendant is sentenced to death while a codefendant receives a life sentence for the same crime is not determinative of proportionality. *See State v. Bonnett,* 348 N.C. 417, 502 S.E.2d 563 (1998); *State v. Lemons,* 348 N.C. 335, 501 S.E.2d 309 (1998).

In the instant case, defendant procured the murder weapon several days before the robbery and used the weapon to eliminate innocent witnesses to the robbery.

It is also proper to compare this case to those where the death sentence was found proportionate. *McCollum,* 334 N.C. at 244, 433 S.E.2d at 164. However, it is unnecessary to cite every case used for comparison. *Id.* We do note that this Court has consistently held the death penalty proportionate in cases in which the defendant was convicted of killing more than one person. *See, e.g., State v. Warren,* 348 N.C. 80, 129, 499 S.E.2d 431, 459, *cert. denied,* —— U.S. ——, 142 L. Ed. 2d 216 (1998); *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 624 (1997); *State v. McHone,* 334 N.C. 627, 435 S.E.2d 296 (1993), *cert. denied,* 511 U.S. 1046, 128 L. Ed. 2d 220 (1994). Even where defendant was convicted of only one count of first-degree murder, this Court has upheld the sentence of death when the motive for the killing was to avoid a lawful arrest. *See State v. McCarver,* 341 N.C. 364, 462 S.E.2d

25 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996); *State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d. 267 (1985). Here, the jury found that defendant committed each murder for the purpose of avoiding and preventing a lawful arrest.

After comparing this case to other roughly similar cases as to the crime and the defendant, we conclude that this case has the characteristics of first-degree murders for which we have previously upheld the death penalty as proportionate. Accordingly, we cannot conclude as a matter of law that the sentences of death are excessive or disproportionate. Therefore, the judgments of the trial court must be and are left undisturbed.

NO ERROR.

Justice WYNN did not participate in the consideration or decision of this case.