STATE OF NORTH CAROLINA v. DANIEL CUMMINGS, JR.

No. 510A99

(Filed 6 April 2001)

### 1. Jury— selection—qualifications—alleged unrecorded private bench discussions—subject matter reconstructed for record

The trial court did not commit prejudicial error in a capital trial by dismissing prospective jurors after unrecorded private bench discussions with those jurors concerning their qualifications to serve on the jury, because: (1) the subject matters of the ex parte discussions at the bench were reconstructed in open court for the record for four of the prospective jurors who were excused prior to voir dire; (2) the record establishes that another juror was dismissed based on his disqualification under N.C.G.S. § 9-3, and defendant has not met his burden to show any alleged ex parte discussion with this juror occurred; and (3) failure to record ex parte communications with prospective jurors under N.C.G.S. § 15A-1241 was harmless for the reasons already stated.

### 2. Appeal and Error— preservation of issues—failure to object

Although defendant contends the trial court committed prejudicial error in a capital trial by failing to call jurors randomly for voir dire and by proceeding in the absence of four prospective jurors who failed to appear for jury service, defendant failed to preserve this issue because: (1) with regard to the constitutional right to a fair and impartial jury, defendant never objected to either the selection or organization of the jury panels; and (2) with regard to an alleged statutory violation under N.C.G.S. § 15A-1214, defendant never challenged the jury panel selection process and never informed the trial court of any objection to the alleged improper handling of the jury venires.

### 3. Indigent Defendants— capital trial—expert assistance

The trial court did not abuse its discretion in a capital trial by denying defendant's motion for the expert services of an optometrist to demonstrate that defendant could not read his rights waiver form at the time he signed it when he was not wearing glasses, because: (1) the record reveals that each time a detective questioned defendant about the victim's murder, the

detective orally advised defendant of his Miranda rights and showed him a written rights waiver form; (2) on each occasion, defendant agreed to talk with the detective and initialed a rights waiver form; and (3) defendant never complained to the authorities that he was unable to read the rights waiver form.

**4. Confessions and Incriminating Statements— motion to suppress—absence of intoxication or impairment—no coercion—voluntary**

The trial court did not commit prejudicial error in a capital trial by denying defendant's motion to suppress his confession, because: (1) defendant has not demonstrated that he was impaired or intoxicated at the time he made the challenged statements; and (2) the record supports the trial court's findings of fact and conclusions of law that defendant's statements were made in the absence of police coercion and were voluntary.

**5. Criminal Law— first-degree murder—jury instruction—admissions**

The trial court did not err in a capital trial by instructing the jury in accordance with the pattern jury instruction that defendant had admitted facts related to the charge of first-degree murder through the testimony of an investigating officer, because: (1) the admissions instruction made it clear that even though there was evidence tending to show that defendant had made an admission, it was solely for the jury to determine whether defendant in fact had made any admission; and (2) it was not required for defendant to admit in open court to the conduct alluded to in the instruction when the trial court did not use the phrase "or it is admitted" while the pattern instructions on murder were given.

**6. Criminal Law— prosecutor's argument—capital trial—defendant's admission of intent to kill victim**

The trial court did not err in a capital trial by failing to intervene ex mero motu to prevent an alleged improper argument by the prosecutor during closing arguments that characterized statements made by defendant to a detective as an admission of intent to kill the victim, because: (1) the prosecutor's argument did not affect the jury's verdict when the jury convicted defendant based on the felony murder rule, and intent to kill is not an element of felony murder; and (2) the prosecutor's argument was a permissible inference from defendant's statement to the detective.

**7. Criminal Law— prosecutor's argument—capital trial— defendant's confession**

The trial court did not err in a capital trial by failing to intervene ex mero motu to prevent an alleged improper argument by the prosecutor during closing arguments that represented that defendant confessed to the murder, because: (1) a review of the prosecutor's entire closing argument reveals that the prosecutor made it clear to the jury that defendant had not actually confessed to the murder; and (2) considered also in the context of the evidence in the record, the challenged statements were permissible inferences.

**8. Criminal Law— prosecutor's argument—capital trial— defendant's untruthful statements**

The trial court did not err in a capital trial by failing to intervene ex mero motu to prevent an alleged improper argument by the prosecutor during closing arguments that defendant had been untruthful in statements he made to a detective because based on the inconsistencies in defendant's statement, the prosecutor's challenge to defendant's truthfulness constitutes a reasonable inference.

**9. Criminal Law— prosecutor's argument—capital trial— defendant went into hiding**

The trial court did not err in a capital trial by failing to intervene ex mero motu to prevent an alleged improper argument by the prosecutor during closing arguments that defendant in essence went into hiding for four days after 19 April 1994, because it was a permissible inference based on the evidence.

**10. Sentencing— capital—evidence of defendant's death sentence for a different murder—course of conduct aggravating circumstance**

The trial court did not err during a capital sentencing proceeding by allowing the jury to hear evidence that defendant received a death sentence for a different murder, because: (1) the evidence was relevant to support the N.C.G.S. § 15A-2000(e)(11) course of conduct aggravating circumstance when the murders occurred two days apart and in both instances defendant robbed and killed elderly victims to obtain money to purchase cocaine; (2) the evidence demonstrated there existed in the mind of defendant a plan, scheme, or design involving the murders of

both victims; and (3) defendant was not prejudiced when the evidence was introduced only in the sentencing proceeding.

**11. Sentencing— capital—aggravating circumstance—pecuniary gain**

The trial court did not err during a capital sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(6) pecuniary gain aggravating circumstance, because defendant was convicted of felony murder where robbery, larceny, or burglary served as the underlying felony.

**12. Sentencing— capital—mitigating circumstances—defendant's confession**

The trial court did not err by failing to submit several requested mitigating circumstances including that he cooperated with officers regarding his burglary, that he confessed freely and voluntarily to the murder of a different victim, and that he cooperated with officers in the investigation of the murder of a different victim, because: (1) a defendant who has repudiated his incriminatory statement is not entitled to the submission of mitigating circumstances that he confessed; and (2) defendant in this case repudiated his incriminating statements.

**13. Homicide— first-degree murder—short form indictment—constitutionality**

Although the short-form murder indictment used to charge defendant with first-degree murder did not allege all the elements of first-degree murder and did not allege aggravating circumstances upon which the State intended to rely to support imposition of the death penalty, the trial court did not err in concluding the indictment was constitutional.

**14. Sentencing— capital—death penalty not disproportionate**

The trial court did not err by imposing the death sentence in a first-degree murder case because: (1) defendant was convicted of felony murder; (2) the jury found the three aggravating circumstances that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6), the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9), and the murder was part of a course of conduct, N.C.G.S. § 15A-2000(e)(11); and (3) defendant badly beat a defenseless elderly woman in her home and left her there to die.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Vosburgh, J., on 24 March 1999 in Superior Court, Robeson County, upon a jury verdict finding defendant guilty of first-degree murder. On 9 March 2000, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 15 February 2001.

*Roy A. Cooper, III, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Janet Moore, Assistant Appellate Defender, for defendant-appellant.*

WAINWRIGHT, Justice.

On 8 August 1994, Daniel Cummings, Jr. was indicted on one count of first-degree murder of Lena Hales, one count of first-degree burglary, and one count of felonious larceny. Defendant was capitally tried before a jury at the 1 March 1999 Criminal Session of Superior Court, Robeson County. On 16 March 1999, the jury found defendant guilty of first-degree murder under the felony murder rule, and of first-degree burglary and felonious larceny. On 24 March 1999, after a capital sentencing proceeding, the jury recommended death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation. The trial court also sentenced defendant to a term of ten years' imprisonment for the larceny conviction and arrested judgment in the burglary conviction.

The State's evidence tended to show that Lena Hales (the victim) was eighty years old at the time of her death. The victim was five feet three inches tall and weighed approximately 117 pounds. She lived alone in her home on Shannon Road in an area of Red Springs, North Carolina, commonly known as the Pecan Orchard. At the time she was killed, the victim had lived at this residence for over fifty-seven years. On the morning of 20 April 1994, Barbara Kinlew, the victim's daughter, received a telephone call from one of her mother's friends, who was worried because she had not heard from the victim. Thereafter, Barbara Kinlew and her son, Gregory Kinlew, went to the victim's house. Upon arriving at the victim's home, Barbara saw that the window to her mother's bedroom was broken, with jagged glass all around it. She and her son raised the window and crawled through it. The victim's bed was on the other side of the window. The bed covers were pulled back, and there was broken glass on the bed.

Barbara saw her mother sitting in her recliner in the living room with her head down. Her mother was wearing her pajamas and her housecoat. She had been badly beaten; the side of the victim's head was bruised and appeared black and blue. In addition, her heavily blood-stained dentures were hanging out of her mouth. The recliner in which the victim was sitting was stained with feces and blood. After Barbara sat down in distress, Gregory stated that he believed he saw the victim move. When Barbara shouted at her, the victim moved her foot. The victim was airlifted to Duke Medical Center, where she was kept alive by machine until the family had the life support removed later that day. Police and Barbara Kinlew later noted that the victim's pocketbook, which she kept on a wardrobe shelf in her bedroom, was on the bed with the victim's change purse on top of the pocketbook. In addition, the wardrobe door was standing open.

Dr. Deborah Radisch, who was accepted at trial as an expert in forensic pathology, performed the autopsy on the victim on 21 April 1994. The autopsy revealed a great deal of external injury to the victim's body, including multiple purple and red bruises with pinpoint areas of bleeding around her face; a torn and bruised lip; blue and purple bruising on her collarbone, left and right shoulders, left ankle, left and right arms, and back; and multiple lacerations and tears in the skin. The victim suffered from a fractured hyoid (neck) bone, apparently as a result of direct trauma, as well as multiple fractured ribs. The victim's brain contained large areas of bruising and swelling, as well as a very large blood clot, or subdural hematoma, which was pressing down on the left side of the brain and affected the victim's ability to breathe. The victim sustained multiple injuries consistent with multiple strikes, blows, or blunt-force inflictions, possibly inflicted by a human fist.

At trial, the State offered the testimony of several witnesses who had seen defendant in the vicinity of the victim's house looking for money in the late evening and early morning of 18 and 19 April 1994. A man fitting defendant's description went to Mary Francis Hughs' front door at approximately 12:05 a.m. on 19 April 1994, asking if a certain person lived on the street. Ms. Hughs responded that no such person lived on the street and slammed the door because defendant began to "look weird" and "inch around." Defendant beat on her door for three minutes until Ms. Hughs' son walked toward her house. Ms. Hughs' son saw defendant walk toward the victim's house, weaving in and out of the neighborhood houses. When Ms. Hughs was shown a

picture of defendant, she stated that it looked like the man who had knocked on her door.

James Teague lived approximately three blocks from the victim's house, and he testified that he knew the victim. Teague also knew defendant from performing mechanical work on defendant's car. Defendant went to Teague's house at approximately 2:00 a.m. on 19 April 1994 and asked him for twenty dollars, stating he "needed it bad." When Teague told defendant that he did not have twenty dollars, defendant walked across Teague's property toward Shannon Road in the direction of the victim's home.

Red Springs law enforcement authorities interviewed defendant on three separate occasions, during which time he made three contradictory statements. When police investigated defendant's first two statements, they determined that the statements were not completely truthful. During the third interview, defendant admitted to breaking into the victim's home and robbing her, but did not admit to harming the victim. Defendant described in detail how he broke into the victim's home, using details that the police had not previously disclosed.

During the sentencing proceeding, the State presented evidence that defendant had admitted that, on 22 April 1994, he shot and killed Burns Babson while robbing the convenience store Babson operated twenty-five feet from Babson's home. On 16 December 1994, defendant was convicted of the first-degree murder of Babson and was sentenced to death. On appeal, this Court found no error. *See State v. Cummings*, 346 N.C. 291, 488 S.E.2d 550 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998).

Mrs. Julie Babson, Burns' wife, testified during the sentencing proceeding that, in the case noted above, she had run into the yard after hearing shots fired and had seen defendant leaving the store. Tom Hunter, a detective with the Major Crimes Unit of Brunswick County, testified during the sentencing proceeding that he interviewed defendant and that defendant admitted to shooting Babson while robbing his store. During one of these interviews, defendant made reference to Hales' murder by admitting that he had broken into a house in Red Springs to rob it but that there was an old lady home. Defendant told Detective Hunter that he had to strike the old lady in self-defense and that she was still alive when he left.

[1] By assignments of error, defendant contends the trial court committed reversible error under the Sixth Amendment to the United

States Constitution and Article I, Section 23 of the North Carolina Constitution when it dismissed six prospective jurors after unrecorded, private bench discussions with them. Defendant also contends the private bench discussions violated his statutory right to recordation under N.C.G.S. § 15A-1241(a).

A review of the jury selection process for this capital trial reveals that, after some jurors had been selected, the trial court asked a new group of prospective jurors questions regarding their qualifications to serve on a jury. Throughout the entire process, defendant and his counsel were present in the courtroom. Specifically, the trial court asked whether any prospective juror: (1) lived outside of Robeson County, (2) was under the age of eighteen, (3) had served on a jury within the last two years, or (4) had been convicted of a felony or been declared mentally incompetent without having his or her citizenship status restored by law. The trial court's questions to the prospective jurors were "obviously designed to insure that the new prospective jurors were qualified to serve under N.C.G.S. § 9-3." *State v. Payne*, 328 N.C. 377, 388, 402 S.E.2d 582, 588 (1991). N.C.G.S. § 9-3 provides as follows:

### § 9-3. Qualifications of prospective jurors.

All persons are qualified to serve as jurors and to be included on the jury list who are citizens of the State and residents of the county, who have not served as jurors during the preceding two years, who are 18 years of age or over, who are physically and mentally competent, who can hear and understand the English language, who have not been convicted of a felony or pleaded guilty or nolo contendere to an indictment charging a felony . . . , and who have not been adjudged non compos mentis. Persons not qualified under this section are subject to challenge for cause.

N.C.G.S. § 9-3 (1999).

After each of the first three statutory inquiries with regard to residency, age, and prior jury service, the trial court asked the jurors to indicate, by raising their hands, whether the specified disqualification applied to them. After conducting the fourth inquiry regarding prior felony convictions and mental competency, however, the trial court stated, "Is there anyone who has been through any of those proceedings who would like to speak to me quietly or privately about it up at the bench?" The record reveals that five prospective jurors re-

STATE v. CUMMINGS

[353 N.C. 281 (2001)]

sponded to the trial court's inquiry and, after private discussions at the bench, were excused prior to *voir dire* by counsel.

It is well settled that the Confrontation Clause of the North Carolina Constitution guarantees the right of every accused to be present at every stage of his trial. N.C. Const. art. I, § 23; *State v. Nobles*, 350 N.C. 483, 491, 515 S.E.2d 885, 891 (1999); *State v. Hartman*, 344 N.C. 445, 454, 476 S.E.2d 328, 333 (1996), *cert. denied*, 520 U.S. 1201, 137 L. Ed. 2d 708 (1997). In a capital case, there is a heightened need for strict adherence to the constitutional mandate that the defendant be personally present at all critical stages of the prosecution. This right, as it pertains to communications of substance between the trial court and a prospective juror, is based on the principle that a defendant should be permitted an opportunity to evaluate and be heard as to whether the proposed judicial action is appropriate under the circumstances. Moreover, defendant's right to be present at every stage of his capital trial is unwaivable. *Nobles*, 350 N.C. at 491, 515 S.E.2d at 891; *State v. Pittman*, 332 N.C. 244, 253, 420 S.E.2d 437, 442 (1992). Jury selection is a stage of a capital trial "at which defendant must be present, and it is 'error for the trial court to exclude the defendant, counsel, and the court reporter from its private communications with the prospective jurors at the bench *prior to excusing them.*'" *State v. Williams*, 339 N.C. 1, 28-29, 452 S.E.2d 245, 262 (1994) (quoting *State v. Smith*, 326 N.C. 792, 794, 392 S.E.2d 362, 363 (1990)) (citation omitted) (alteration in original), *cert. denied*, 516 U.S. 833, 133 L. Ed. 2d 61 (1995).

A violation of defendant's right to presence is, however, "subject to harmless error analysis, the burden being upon the State to demonstrate the harmlessness beyond a reasonable doubt." *Id.* at 29, 452 S.E.2d at 262; *accord Hartman*, 344 N.C. at 454, 476 S.E.2d at 333. We have held such error harmless where "'the transcript reveals the substance of the conversations, or the substance is adequately reconstructed by the trial judge at trial.'" *State v. Adams*, 335 N.C. 401, 409, 439 S.E.2d 760, 763 (1994) (quoting *State v. Boyd*, 332 N.C. 101, 106, 418 S.E.2d 471, 474 (1992)); *see also State v. Ali*, 329 N.C. 394, 405, 407 S.E.2d 183, 190 (1991). In conducting harmless error review in this context, we have stated:

> Whether this kind of error is harmless depends, we conclude, on whether the questioning of prospective jurors in defendant's absence might have resulted in a jury composed differently from one which defendant might have obtained had he been present and participated in the process. We are satisfied here beyond a

reasonable doubt that defendant's absence during the preliminary questioning of prospective jurors did not result in the rejection of any juror whom defendant was entitled to have on the panel or the seating of any juror whom defendant was entitled to reject either for cause or peremptorily.

*Payne*, 328 N.C. at 389, 402 S.E.2d at 589; *accord Williams*, 339 N.C. at 29-30, 452 S.E.2d at 262.

Under the rationale of our decision in *Payne*, we conclude that the State has met its burden of establishing that the trial court's violation of defendant's right to presence was harmless beyond a reasonable doubt. With regard to prospective jurors McLain, Pierce, Sweat, and Gonzales, the record reveals that the subject matters of the *ex parte* discussions at the bench were reconstructed in open court for the record. Prospective juror McLain was excused after the trial court expressed concerns regarding his competency. The trial court also noted for the record that prospective juror McLain requires daily injections. Prospective jurors Pierce and Sweat were excused because each had "served as jurors during the preceding two years." N.C.G.S. § 9-3. Prospective juror Gonzales was excused based on his inability to "hear and understand the English language." *Id.* The record reveals that prospective juror Gonzales was accompanied by an interpreter when he spoke privately with the trial court.

With respect to prospective juror Kenny Locklear, the record reveals that, like prospective juror McLain, he apparently responded to the trial court's fourth statutory inquiry regarding whether any prospective juror had been convicted of a felony or declared mentally incompetent. Immediately after the trial court dismissed prospective juror McLain based on the fourth statutory inquiry, the clerk of court stated, "Judge, there's another one." Although the trial court did not state for the record the nature of its discussion with Kenny Locklear, the record clearly establishes that the trial court excused him based on his disqualification under N.C.G.S. § 9-3. Indeed, immediately after excusing Kenny Locklear, the trial court stated, "I'm only talking to people right now who have some serious question as to whether or not they're qualified to serve on the jury." ·

Because prospective jurors McLain, Pierce, Sweat, Gonzales, and Kenny Locklear were not qualified to serve under N.C.G.S. § 9-3, the trial court's private discussions with these prospective jurors did not "result in the rejection of any juror whom defendant was entitled to have on the panel." *Payne*, 328 N.C. at 389, 402 S.E.2d at 589. Rather,

these prospective jurors were dismissed for "manifestly unobjectionable reasons regardless of what defendant might have observed or desired." *Id.*; *accord Adams*, 335 N.C. at 409, 439 S.E.2d at 764. Accordingly, the State has met its burden of demonstrating that the trial court's *ex parte* communications with prospective jurors were harmless beyond a reasonable doubt.

With respect to prospective juror Wayne Locklear, the record does not support defendant's assertion that the trial court improperly excused him after a private communication at the bench. "It is defendant's burden on appeal to demonstrate in the first place that error occurred." *Williams*, 339 N.C. at 30, 452 S.E.2d at 263. Moreover, "[i]t is not enough for defendant to assert that there may have been other impermissible *ex parte* communications. The record must reveal that such communications in fact occurred." *Adams*, 335 N.C. at 410, 439 S.E.2d at 764. " '[W]hatever incompleteness may exist in the record precludes defendant from showing that error occurred as to any [prospective] juror other than those the trial judge excused or deferred on the record.' " *Nobles*, 350 N.C. at 494, 515 S.E.2d at 892 (quoting *Adams*, 335 N.C. at 410, 439 S.E.2d at 764) (second alteration in original). Defendant has not met his burden in this case because he has not demonstrated, and the record does not otherwise reveal, that the alleged *ex parte* discussion with prospective juror Wayne Locklear occurred.

Defendant further points out that N.C.G.S. § 15A-1241 requires complete recordation of jury selection in capital proceedings. N.C.G.S. § 15A-1241 (1999). Thus, the trial court also erred in failing to record its *ex parte* communications with prospective jurors under section 15A-1241. *See Nobles*, 350 N.C. at 494, 515 S.E.2d at 892. We conclude, however, that this failure was harmless for the reasons stated above. Accordingly, these assignments of error are overruled.

[2] By assignments of error, defendant contends the trial court erred by failing to call jurors randomly for *voir dire* and by proceeding in the absence of four prospective jurors who failed to appear for jury service. Defendant concedes the trial court randomly placed prospective jurors into separate panels prior to *voir dire*. However, defendant contends the panels were organized in such a manner that jurors were not called for individual *voir dire* in a random manner. Defendant argues the trial court's actions violated the randomness requirement of N.C.G.S. § 15A-1214(a), the purpose of which is to

protect a defendant's state and federal constitutional rights to a fair and impartial jury.

Constitutional questions that are not raised and passed upon in the trial court will not ordinarily be considered on appeal. *State v. Braxton*, 352 N.C. 158, 173, 531 S.E.2d 428, 436-37 (2000), *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 797 (2001); *accord Nobles*, 350 N.C. at 495, 515 S.E.2d at 893. In the present case, defendant contends the trial court violated his constitutional rights to a fair and impartial jury. The record reveals, however, that defendant never objected to either the selection or the organization of the jury panels. Therefore, defendant has · waived review of the constitutionality of the trial court's conduct in this regard. *See Braxton*, 352 N.C. at 173, 531 S.E.2d at 436-37.

With regard to the alleged statutory violation, N.C.G.S. § 15A-1214 provides in pertinent part:

> (a) The clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called. When a juror is called and he is assigned to the jury box, he retains the seat assigned until excused.

N.C.G.S. § 15A-1214(a) (1999). A defendant's challenge to the jury must satisfy N.C.G.S. § 15A-1211, which provides that a challenge: (1) "[m]ay be made only on the ground that the jurors were not selected or drawn according to law," (2) "[m]ust be in writing," (3) "[m]ust specify the facts constituting the ground of challenge," and (4) "[m]ust be made and decided before any juror is examined." N.C.G.S. § 15A-1211(c) (1999); *see also State v. Atkins*, 349 N.C. 62, 102-03, 505 S.E.2d 97, 122 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999); *State v. Workman*, 344 N.C. 482, 498-99, 476 S.E.2d 301, 310 (1996).

In the present case, defendant failed to comply with N.C.G.S. § 15A-1211(c). As in *Braxton*, defendant here "never challenged the jury panel selection process and never informed the trial court of any objection to the allegedly improper handling of the jury venires." *Braxton*, 352 N.C. at 177, 531 S.E.2d at 439. Because defendant "failed to follow the procedures clearly set out for jury panel challenges and further failed, in any manner, to alert the trial court to the alleged improprieties," *Atkins*, 349 N.C. at 103, 505 S.E.2d at 122, we conclude that defendant failed to preserve this issue for appellate review. Accordingly, these assignments of error are overruled.

By assignments of error, defendant contends the trial court erred by denying his motion for expert services and his motion to suppress his confession. Defendant argues that he needed the services of an optometrist to demonstrate that he could not read his rights waiver form at the time he signed it because he was not wearing glasses. Defendant also contends his confession was involuntary because of the "coercive atmosphere" surrounding his statements, his below-average intellect, and his impaired judgment and impulse control, and because he engaged in a "days-long cocaine binge" prior to his arrest. Defendant argues the trial court's errors violated his constitutional and statutory rights and entitle him to a new trial. We disagree.

[3] In order to obtain state-funded expert assistance, a defendant must make " 'a particularized showing that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case.' " *State v. McNeill*, 349 N.C. 634, 650, 509 S.E.2d 415, 424 (1998) (quoting *State v. Parks*, 331 N.C. 649, 656, 417 S.E.2d 467, 471 (1992)), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999); *see also* N.C.G.S. § 7A-450(b) (1999). Moreover, " '[t]he trial court has discretion to determine whether a defendant has made an adequate showing of particularized need.' " *State v. Anderson*, 350 N.C. 152, 161, 513 S.E.2d 296, 302 (quoting *State v. Page*, 346 N.C. 689, 697, 488 S.E.2d 225, 230 (1997), *cert. denied*, 522 U.S. 1056, 139 L. Ed. 2d 651 (1998)), *cert. denied*, 528 U.S. 973, 145 L. Ed. 2d 326 (1999).

In the present case, the record reveals that, after hearing evidence from the State and defendant, the trial court entered an order containing findings of fact and concluded that defendant's motion for the expert services of an optometrist should be denied. In its order, the trial court found in pertinent part:

That at the time of the *Miranda* warnings initially in the Sampson County jail, or an office adjacent thereto, regardless of the vision of the defendant, the defendant indicated verbally to the officer that he understood his rights. And on April 23rd, 1994, he wrote the answers to each of the questions and entered his initials thereon in the correct place without assistance[.]

In addition to providing the answers and his initials in the proper places, the defendant signed the forms in the proper place, and along the lines that were provided for the presentation of his signature[.]

After a thorough review of the record, we hold that the trial court's findings in this regard are supported by the evidence. Indeed, the record reveals that each time Detective Edward Ben Smith questioned defendant about the victim's murder, he orally advised defendant of his *Miranda* rights and showed him a written rights waiver form. On each occasion, defendant agreed to talk with Smith and initialed a rights waiver form. Moreover, defendant never complained to the authorities that he was unable to read the rights waiver forms.

Based on this record, we do not believe defendant has demonstrated that the services of an optometrist would have " 'materially assist[ed] him in the preparation of his case.' " *McNeill*, 349 N.C. at 650, 509 S.E.2d at 424 (quoting *Parks*, 331 N.C. at 656, 417 S.E.2d at 471). Because Smith read defendant his *Miranda* rights, defendant's ability to read the waiver forms himself is irrelevant. Moreover, we note that defendant signed the rights waiver forms in 1994 and did not request the services of an optometrist until 1999. Therefore, we conclude the trial court did not abuse its discretion in denying defendant's motion for the expert assistance of an optometrist.

**[4]** We likewise conclude the trial court did not err by denying defendant's motion to suppress his confession. At the outset, we note that "the United States Supreme Court has declined to create a constitutional requirement that defendants must confess their crimes 'only when totally rational and properly motivated,' in the absence of any official coercion by the State." *State v. Cheek*, 351 N.C. 48, 63, 520 S.E.2d 545, 554 (1999) (quoting *Colorado v. Connelly*, 479 U.S. 157, 166, 93 L. Ed. 2d 473, 484 (1986)), *cert. denied*, —— U.S. ——, 147 L. Ed. 2d 965 (2000). Moreover, we have consistently held "that 'police coercion is a necessary predicate to a determination that a waiver or statement was not given voluntarily,' and without police coercion, the question of voluntariness does not arise within the meaning of the Due Process Clause of the Fourteenth Amendment." *State v. Morganherring*, 350 N.C. 701, 722, 517 S.E.2d 622, 635 (1999) (quoting *State v. McKoy*, 323 N.C. 1, 21-22, 372 S.E.2d 12, 23 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990)), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000); *accord Cheek*, 351 N.C. at 63, 520 S.E.2d at 554.

In the present case, defendant has not demonstrated that he was impaired or intoxicated at the time he made the challenged statements. Moreover, the record supports the trial court's findings of fact

and conclusions of law that defendant's statements were made in the absence of police coercion and were voluntary.

These assignments of error are overruled.

By assignments of error, defendant contends the trial court erred by instructing the jury, in accordance with the pattern jury instruction, that defendant had admitted facts related to the charge of first-degree murder. Defendant further argues the trial court erred in failing to intervene *ex mero motu* to prevent improper argument by the prosecutor during closing arguments. We disagree.

[5] During his charge to the jury, the trial court instructed the jury in accordance with North Carolina Pattern Instructions 104.60 and 104.70, respectively, as follows:

> There is evidence which tends to show that the defendant has admitted a fact or facts relating to the crimes charged in these cases. If you find that the defendant has made those admissions, then you should consider all of the circumstances under which they were made in determining whether they were truthful admissions and the weight that you will give to them.

> There is evidence which tends to show that the defendant confessed that he committed the crimes of burglary and larceny in this case. If you find that the defendant made those confessions, then you should consider all of the circumstances under which it [sic] was made in determining whether it was a truthful confession and the weight that you will give to it.

*See* N.C.P.I.—Crim. 104.60, 104.70 (1970).

The record reveals that the trial court's admission instruction was based, in part, on testimony from Smith. When Smith questioned defendant on 23 April 1994, he described the victim to defendant as "a frail 80 year old female." In response, defendant stated: "A man meant to kill the lady because all you would have had to do was to push her down." During the charge conference, the State characterized defendant's response to Smith's description of the victim as "admissions with regard to the more serious charge of homicide" and requested that the trial court submit to the jury the pattern instruction on admissions.

This Court has previously found no error in the submission of an identical admission instruction where, as here, the alleged admission was introduced into evidence through the testimony of an investigat-

ing officer. *See State v. McKoy*, 331 N.C. 731, 733-34, 417 S.E.2d 244, 246 (1992). In *McKoy*, we noted that the admissions instruction "made it clear that even though there was evidence tending to show that the defendant had made an admission, it was solely for the jury to determine whether the defendant in fact had made any admission." *Id.* at 734, 417 S.E.2d at 246-47.

Nonetheless, defendant contends North Carolina law is "clear" that the admissions instruction, N.C.P.I.—Crim. 104.60, should not be submitted to the jury unless defendant admits in open court to the conduct alluded to in the instruction. Defendant cites this Court's decisions in *State v. Shuford*, 337 N.C. 641, 447 S.E.2d 742 (1994), and *State v. McCoy*, 303 N.C. 1, 277 S.E.2d 515 (1981), in support of his argument.

Contrary to defendant's argument, however, our holdings in *McCoy* and *Shuford*, do not support his position. Rather, in both *Shuford* and *McCoy*, this Court held that the phrase " 'or it is admitted' " should not be included in the pattern instruction on murder " 'where the defendant does not in open court admit to an intentional [killing].' " *Shuford*, 337 N.C. at 646-47, 447 S.E.2d at 745 (quoting *McCoy*, 303 N.C. at 29, 277 S.E.2d at 535). The pattern instruction on murder that defendant references provides in pertinent part:

If the State proves beyond a reasonable doubt, (*or it is admitted*) that the defendant intentionally killed the victim with a deadly weapon or intentionally inflicted a wound upon the deceased with a deadly weapon that proximately caused the victim's death, you may infer first, that the killing was unlawful, and second, that it was done with malice, but you are not compelled to do so.

N.C.P.I.—Crim. 206.10 (1998).

In the present case, the trial court did not use the phrase "or it is admitted" when the pattern instruction on murder was given. Accordingly, our holdings in *Shuford* and *McCoy* are not implicated in this case. Because the admissions instruction, N.C.P.I.—Crim. 104.60, was supported by the evidence in this case, the trial court did not err in submitting the instruction to the jury.

We turn now to defendant's argument that the trial court failed to intervene *ex mero motu* to prevent improper closing argument by the prosecutor. When, as here, a defendant fails to object during closing argument, the standard of review is whether the argument was "so grossly improper that the trial court erred in failing to intervene

*ex mero motu." State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999). " '[O]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken.' " *State v. Davis*, 353 N.C. 1, 31, 539 S.E.2d 243, 263 (2000) (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996)).

" 'Trial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom.' " *State v. Hyde*, 352 N.C. 37, 56, 530 S.E.2d 281, 294 (2000) (quoting *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999)), *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 775 (2001). This Court will not disturb the trial court's exercise of discretion over the latitude of counsel's argument absent any gross impropriety in the argument that would likely influence the jury's verdict. *See State v. McNeil*, 350 N.C. 657, 685, 518 S.E.2d 486, 503 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000). "We further emphasize that 'statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal. Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred.' " *Guevara*, 349 N.C. at 257, 506 S.E.2d at 721 (quoting *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)).

**[6]** Defendant first argues that the prosecutor improperly characterized statements made by defendant to Smith as an admission of intent to kill the victim. The prosecutor stated in pertinent part:

> And then [defendant told Detective Smith], "You know, whoever did that meant to kill that woman because all you have to do is push her down to get her money." And that's important. That statement is very important. That whoever did it meant to kill Lena Hales. And why is that important? Because one of the things the Judge will talk to you about when he explains the law to you is that the State has to show, in order for you to find someone guilty of first-degree murder under the theory of premeditation and deliberation, the State has to show that the individual intended to kill.

STATE v. CUMMINGS

[353 N.C. 281 (2001)]

> When you look back over all the evidence, look back at the things that [defendant] said, and the things that the evidence shows you, *I would argue to you, ladies and gentlemen, that amounts to—that amounts to an admission by the defendant of what his intention was on the morning of April the 19th, that whoever did this intended to kill [the victim] because, in his words, all you had to do was push her down.*

(Emphasis added.)

At the outset, we note that the jury did not convict defendant of first-degree murder based on a theory of premeditation and deliberation. Rather, the jury convicted defendant of first-degree murder based on the felony murder rule. Because intent to kill is not an element of felony murder, *see State v. York*, 347 N.C. 79, 97, 489 S.E.2d 380, 390 (1997), the prosecutor's argument that defendant intended to kill the victim did not affect the jury's verdict, *see McNeil*, 350 N.C. at 685, 518 S.E.2d at 503. Moreover, the prosecutor's argument in this regard was a permissible inference from defendant's statements to Smith. Assuming *arguendo* the prosecutor's argument was improper, it was not so "grossly improper" as to require the trial court to intervene *ex mero motu*. *See State v. Gladden*, 315 N.C. 398, 424, 340 S.E.2d 673, 689 (prosecutor's argument, though not supported by the evidence, was not so grossly improper as to warrant *ex mero motu* intervention by the trial court), *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986).

**[7]** Defendant next argues the prosecutor improperly misrepresented in his final summation to the jury that defendant confessed to the murder. The prosecutor concluded as follows:

> He should be found guilty on all three counts. That's what the evidence says and that's what the law says, and that's what [defendant] told you when he talked to [Detective] Ben Smith on April the 26[th], 1994, when he confessed to the murder and admitted to the murder of Lena Hales. The evidence, both direct and circumstantial, supports that.

As previously noted, closing remarks should not be " 'placed in isolation,' " but must be examined in " 'the context in which the remarks were made and the overall factual circumstances to which they referred.' " *Guevara*, 349 N.C. at 257, 506 S.E.2d at 721 (quoting *Green*, 336 N.C. at 188, 443 S.E.2d at 41). Our review of the prosecutor's entire closing argument reveals that the prosecutor made it clear to the jury that defendant had not actually confessed to murder.

Rather, the prosecutor merely suggested that the jury should infer from defendant's statements to Smith that defendant committed the murder. During other portions of his argument to the jury, the prosecutor argued as follows:

> For the third time the defendant waives those rights and is willing to answer questions. The result is that the defendant begins to tell the truth about what really happened. *But he doesn't tell the whole truth because he stops short. Because if he tells the whole truth, he then confesses to a murder.*

(Emphasis added.)

At another time, the prosecutor argued as follows:

> But yet he's left part of the story untold, and that's the part that hurts the most. The part where he really did something.
>
> Now, don't get me wrong, burglary is a very serious offense. First-degree burglary is the most serious property crime there is. . . . But there is nothing, nothing more serious than killing another person in a manner that is cruel, a manner that was brutal, and in a manner that showed a callous disregard for a person's life or their rights or their safety.
>
> There's nothing more serious than first-degree murder. . . . [N]o one has the right to unlawfully take the life of another person and that's what [defendant] did. *He doesn't want to tell you that, and he didn't want to tell Smith that when he was interviewed because I would argue to you, ladies and gentlemen, he knows what would happen.*
>
> So he tells part of the story and leaves the worse part untold. *But the evidence tells the remaining part of the story.* Why? Because no one saw Lena Hales until Barbara Kinlew and Greg Kinlew crawled in that window April the 20th. Mrs. Hales was physically unable to call for help because the defendant had left her in such a condition that she couldn't do anything. She was barely alive when they found her. She had been sitting there in that chair for more than 24 hours. She didn't have any way of helping herself. She couldn't get to the phone.

(Emphasis added.)

The record further reveals that defendant did confess to Smith that he kicked in a window at the victim's residence, entered the

residence, then grabbed the victim by the arm and demanded money from her. Defendant also told Smith that he left the victim's home without harming her after she gave him all the money from her pocketbook.

Considered in the context of the evidence in the record and the prosecutor's entire argument to the jury, the challenged statements were permissible inferences based on the evidence and were not grossly improper. Accordingly, the trial court did not err in failing to intervene *ex mero motu.*

[8] Defendant next argues the prosecutor improperly argued that defendant had been untruthful in statements he made to Smith. The prosecutor argues as follows:

What does Smith do? "Daniel, you know what you told me the other day? Well, I went and talked to these people and what you're saying and what they're saying just doesn't match up." Now, you read between the lines, ladies and gentlemen, of what he's telling them and what they're finding out don't match up. Somebody is not telling the truth about what they did and what went on.

The record reveals that in his first two statements to Smith, defendant gave various details about his activities on the night in question, but defendant did not admit to breaking into the victim's home. In his third statement, however, defendant confessed to breaking into the victim's home and taking money from her. In addition to this inconsistency, on one occasion defendant told Smith that on the night in question he had never been at the Pecan Orchard—the area where the victim's residence was located. However, in the same statement, defendant told Smith that he had visited James Teague on the night in question, an individual whose residence was located in the Pecan Orchard area.

Based on the inconsistencies in defendant's statement, the prosecutor's challenge to defendant's truthfulness constitutes a reasonable inference from the evidence. Assuming *arguendo* that the prosecutor's argument was improper, we conclude the challenged argument was not so "grossly improper" as to require the trial court to intervene *ex mero motu.*

[9] Finally, defendant argues the prosecutor's assertion, that defendant went into hiding for four days after 19 April 1994, was not based on the evidence. The prosecutor argued in pertinent part as follows:

The defendant wasn't located until two days—excuse me, let me get my math figured out—four days, four days had passed from the time that this occurred until he was located in Sampson County in jail. What he's done between then and when they find him? No one knows. Is he cleaned up? Has he washed his hands? We don't know that. . . . [Defendant], in essence, went into hiding for four days. No one could find him in Red Springs. No one had seen him in Red Springs. Then he, low [sic] and behold, ends up in jail in Sampson County is where they locate him.

The record reveals that on 20 April 1994, Smith began investigating the murder of the victim. After questioning individuals who had seen defendant late at night, in the early morning hours of 19 April 1994, Smith began a search for defendant. Smith drove by defendant's residence and did not observe any vehicles. He then searched for defendant around Red Springs, North Carolina, but did not locate him. Smith questioned several individuals concerning defendant's whereabouts, but was unable to locate defendant. On 23 April 1994, Smith located defendant in the Sampson County jail. Based on this record evidence, the prosecutor's argument that defendant, *"in essence*, went into hiding for four days" constitutes a permissible inference based on the evidence. (Emphasis added.) Assuming *arguendo* that the prosecutor's argument was improper, we conclude it was not so grossly improper as to warrant *ex mero motu* action by the trial court.

These assignments of error are overruled.

**[10]** By assignments of error, defendant contends the trial court committed constitutional error by allowing the jury in the sentencing proceeding to hear evidence that defendant received a death sentence for the murder of Babson. We disagree.

During the sentencing proceeding, the prosecutor introduced evidence of a different murder of which defendant had been convicted and for which he had received a death sentence, in order to support the submission of the (e)(11) aggravating circumstance. The (e)(11) aggravating circumstance provides that "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11) (1999).

Submission of this aggravating circumstance is proper when there is evidence that the victim's murder and other violent

crimes were part of a pattern of intentional acts establishing that there existed in defendant's mind a plan, scheme, or design involving both the murder of the victim and other crimes of violence.

*State v. Gregory*, 340 N.C. 365, 414, 459 S.E.2d 638, 666 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996); *see also State v. Cummings*, 332 N.C. 487, 508, 422 S.E.2d 692, 704 (1992).

In the present case, the evidence of defendant's conviction for Babson's murder was clearly relevant to support submission of the (e)(11) aggravating circumstance. The murder of Babson occurred two days after the murder of the victim in this case. In both instances, defendant robbed and killed elderly victims to obtain money to purchase cocaine. Therefore, evidence regarding defendant's murder of Babson was properly admitted to demonstrate that there existed in the mind of defendant a plan, scheme, or design involving the murders of both Hales and Babson. *See Cummings*, 346 N.C. at 329, 488 S.E.2d at 572-73; *see also State v. Smith*, 347 N.C. 453, 496 S.E.2d 357 (evidence of a murder that defendant committed less than one month before committing the crimes at issue in the case was properly admitted during the sentencing proceeding to support the (e)(11) aggravating circumstance that the murder was part of a course of conduct including other crimes of violence against other persons), *cert. denied*, 525 U.S. 845, 142 L. Ed. 2d 91 (1998).

We likewise reject defendant's contention that the challenged evidence prejudiced him. Defendant relies on our decision in *State v. Britt*, 288 N.C. 699, 220 S.E.2d 283 (1975), to support his argument. In *Britt*, we held that it was prejudicial error for the prosecutor to elicit on cross-examination of defendant the fact that defendant had been previously convicted of, and had received a death sentence for, the same murder for which he was being retried. *Id.* at 713, 220 S.E.2d at 292. We concluded that introducing such information during the *guilt phase* of the trial was "highly improper and incurably prejudicial." *Id.* The case at hand is clearly distinguishable from *Britt*. At the outset, we note that, unlike the defendant in *Britt*, defendant here was not retried for the same murder. In addition, the prosecution introduced evidence of defendant's conviction for Babson's murder only in the *sentencing proceeding*. The jury had already determined that defendant was guilty of Hales' murder before any evidence of Babson's murder was introduced. Therefore, unlike the defendant in *Britt*, defendant was not prejudiced in the present case. *See also Romano v. Oklahoma*, 512 U.S. 1, 129 L. Ed. 2d 1 (1994) (no due process viola-

tion in allowing into evidence, at the sentencing hearing for defendant of one murder, a judgment showing that he had received a death sentence in another murder, which was offered solely to support the existence of an aggravating circumstance). These assignments of error are overruled.

**[11]** By an assignment of error, defendant contends that the trial court violated defendant's statutory and constitutional rights by submitting the (e)(6) aggravating circumstance. We disagree.

The (e)(6) aggravating circumstance states that "[t]he capital felony was committed for pecuniary gain." N.C.G.S. § 15A-2000(e)(6) (1999). We have consistently upheld the submission of the pecuniary gain aggravating circumstance for purposes of sentencing a defendant convicted of felony murder where robbery, larceny, or burglary served as the underlying felony. *See, e.g., State v. Chandler*, 342 N.C. 742, 755, 467 S.E.2d 636, 644, *cert. denied*, 519 U.S. 875, 136 L. Ed. 2d 133 (1996); *State v. Taylor*, 304 N.C. 249, 288-89, 283 S.E.2d 761, 785 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983); *State v. Oliver*, 302 N.C. 28, 62, 274 S.E.2d 183, 204 (1981).

In *Oliver*, we stated that

robbery constitutes an essential element of felony murder. . . . The circumstance that the capital felony was committed for pecuniary gain, however, is not such an essential element. . . . While [defendant's] motive does not constitute an element of the offense, it is appropriate for it to be considered on the question of his sentence.

*Oliver*, 302 N.C. at 62, 274 S.E.2d at 204. In *Chandler*, we held that this same reasoning applies to felony murder where, as here, burglary serves as the underlying felony, in that "[b]urglary is an essential element of felony murder[,] [but] [p]ecuniary gain is not such an essential element." *Chandler*, 342 N.C. at 756, 467 S.E.2d at 644. We find *Oliver* and its progeny to be dispositive of this issue, and defendant has given us no reason to depart from our prior decisions. Therefore, this assignment of error is overruled.

**[12]** By an assignment of error, defendant contends the trial court violated his statutory and constitutional rights by failing to submit requested mitigating circumstances. We disagree.

Defendant filed a written request with the trial court for both statutory and nonstatutory mitigating circumstances. The trial court

agreed to submit defendant's requested mitigating circumstances, with the exception of four:

3. The defendant cooperated with Red Springs Law Enforcement officers regarding his burglary of the home of Lena Hales prior to arrest.

4. The defendant's culpability for the burglary of the home of Lena Hales in Red Springs could not have been attributed to this defendant without his confession which he provided to law enforcement officers freely and voluntarily.

. . . .

17. The defendant voluntarily confessed to Brunswick County Law Enforcement officers with respect to the murder of Burns Babson.

18. The defendant cooperated with Brunswick County Law Enforcement officers in the investigation of the murder of Burns Babson.

We have consistently held that a defendant who has repudiated his incriminatory statement is not entitled to the submission of mitigating circumstances that he confessed. *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); *State v. Hayes*, 314 N.C. 460, 474, 334 S.E.2d 741, 749 (1985). "[W]hen a defendant moves to suppress a confession, he repudiates it and is not entitled to use evidence of the confession to prove this mitigating circumstance." *State v. Smith*, 321 N.C. 290, 292, 362 S.E.2d 159, 160 (1987).

In this case, defendant gave false alibis in his first two interviews with police from Red Springs with regard to the murder of the victim in this case. During the third interview, defendant confessed only to breaking and entering the victim's residence during the night, but did not admit to hurting her. During a series of interviews with Brunswick County law enforcement officers about Babson's murder, defendant first stated that another man robbed Babson. Thereafter, defendant admitted to killing Babson and attacking Hales in Robeson County. Defendant later filed a pretrial motion in which he moved to suppress all of his statements to law enforcement officers from Red Springs, Sampson and Brunswick counties, claiming the statements were "made involuntarily." During pretrial motion hearings, defendant, under oath, denied being in Babson's store and denied breaking

into Hales' home. Because defendant repudiated his incriminating statements, the trial court did not err by denying his motion to submit the requested mitigating circumstances. This assignment of error is overruled.

[13] By assignments of error, defendant contends the short-form murder indictment violated his state and federal constitutional rights, as it failed to allege all elements of first-degree murder and failed to allege aggravating circumstances upon which the State intended to rely to support imposition of the death penalty. In support of his position, defendant cites the United State Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000), and *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999).

We have repeatedly addressed and rejected defendant's argument. *See Braxton*, 352 N.C. 158, 531 S.E.2d 428. In *Braxton*, this Court examined the validity of short-form indictments in light of the Supreme Court's decisions in *Jones*, 526 U.S. 227, 143 L. Ed. 2d 311, and *Apprendi*, 530 U.S. 466, 147 L. Ed. 2d 435, and concluded that nothing in either case altered prior case law on these matters. *Braxton*, 352 N.C. at 175, 531 S.E.2d at 437-38. Defendant has presented no compelling basis for this Court to revisit the issue in the present case. Accordingly, these assignments of error are overruled.

## PRESERVATION ISSUES

Defendant raises nine additional issues that he concedes this Court has previously decided contrary to his position: (1) the trial court violated defendant's statutory and constitutional rights by admitting into evidence illegally obtained statements; (2) the trial court violated defendant's statutory and constitutional rights by excusing fourteen prospective jurors for cause on the ground that they would be unable to return a sentence of death; (3) the trial court committed reversible constitutional error by failing to instruct jurors that they "must" rather than "may" consider mitigating circumstances when deciding Issues Three and Four during their jury deliberations; (4) the trial court committed reversible constitutional error by placing the burden of proof on defendant to satisfy the jury with respect to mitigating circumstances and refusing to instruct jurors that proof by the preponderance of the evidence is proof which indicates that it is more likely than not that a mitigating circumstance exists; (5) the trial court committed reversible constitutional error by erroneously

instructing jurors that they could find a mitigating circumstance exists and simultaneously find that the mitigating circumstance has no mitigating value; (6) the trial court committed plain error by erroneously instructing the jury that unanimity is required to answer "no" to Issues One, Three, and Four on the issues and recommendation sentencing form; (7) the trial court committed plain error by failing to instruct the jury that unanimity is required to answer "yes" to Issue Four on the issues and recommendation sentencing form; (8) the trial court committed reversible constitutional error by instructing the jury on the (e)(9) aggravating circumstance; and (9) the trial court committed reversible constitutional error by instructing the jury on the (e)(11) aggravating circumstance. Defendant makes these arguments in order to allow this Court to reexamine its prior holdings and to preserve these issues for any possible further judicial review. We have thoroughly considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, these assignments of error are overruled.

## PROPORTIONALITY REVIEW

[14] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we are required to review and determine: (1) whether the evidence supports the jury's finding of any aggravating circumstances upon which the sentence of death was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder under the felony murder rule. Following a capital sentencing proceeding, the jury found three aggravating circumstances: (1) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); (2) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (3) the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11).

Three statutory mitigating circumstances were submitted for the jury's consideration: (1) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (2) the capacity of the defendant to appreciate the

criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); and (3) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence that any juror deems to have mitigating value, N.C.G.S. § 15A-2000(f)(9). Of these statutory mitigating circumstances, the jury found only (f)(2) to exist. Of the twelve nonstatutory mitigating circumstances submitted by the trial court, the jury found none to exist or have mitigating value.

After thoroughly examining the record, transcript, briefs, and oral arguments in this case, we conclude that the evidence fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We turn then to our final statutory duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

We have found the death sentence disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Here, defendant badly beat a defenseless, elderly lady and left her to die. Moreover, the conduct of defendant that led to the victim's death

was carried out in the victim's own home. "A murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] . . . an especially private place, one [where] . . . a person has a right to feel secure.' " *State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)) (alterations in original), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998).

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we review all cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.*; *accord State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998).

There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to support a sentence of death. *State v. Warren*, 347 N.C. 309, 328, 492 S.E.2d 609, 619 (1997), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998). The N.C.G.S. § 15A-2000(e)(9) and (e)(11) statutory aggravating circumstances, both of which the jury found here, are among those four. *See State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Thus, we conclude that the present case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. Therefore, based upon the characteristics of this defendant and the crime he committed, we are convinced that the sentence of death recommended by the jury and ordered by the trial court in the instant case is not disproportionate.

Accordingly, we conclude that defendant received a fair trial, free from prejudicial error. The judgments and sentences entered by the trial court, including the sentence of death for first-degree murder, must therefore be left undisturbed.

NO ERROR.